**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **IVAN G. RICE,** | § | |
| | § | |
| **Plaintiff,** | § | **No. 05-187C** |
| | § | |
| **vs.** | § | |
| | § | **Senior Judge James F. Merow** |
| **THE UNITED STATES** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. SUMMARY OF THE ARGUMENT ........ 2

III. BACKGROUND ........ 3

A. The Invention ........ 3

B. Prosecution of the '499 Patent ........ 5

IV. LEGAL STANDARD ........ 6

A. General Rules For Claim Construction ........ 6

B. Other Applicable Rules for Claim Construction ........ 8

V. DISCUSSION ........ 9

A. Externally Mounted Intercooler ........ 10

B. Outlet Duct Configured to Radially Expand ........ 16

C. Return Duct Configured For Low Radial Flow Velocity ........ 19

D. Connections ........ 21

E. The Flow Areas Limitation ........ 23

F. Agreed Terms ........ 30

VI. CONCLUSION AND PRAYER FOR RELIEF ........ 31

# TABLE OF AUTHORITIES

## CASES

*Acumed LLC v. Stryker Corp.*,
483 F.3d. 800 (Fed. Cir. 2007) .......... 8

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) .......... 8

*Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*,
262 F.3d 1258 (Fed. Cir. 2001) .......... 7

*Biagro W. Sales Inc. v. Grow More Inc.*,
423 F.3d 1296 (Fed. Cir. 2005) .......... 6

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002) .......... 7

*Elbex Video, Ltd. v. Sensormatic Electronics Corp.*,
508 F.3d 1366 (Fed. Cir. 2007) .......... 8

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
381 F.3d 1111 (Fed. Cir. 2004) .......... 6

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
430 F.3d 1377 (Fed. Cir. 2005) .......... 9

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) .......... 8

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) .......... 1, 6

*Omega Engineering, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) .......... 9, 12

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......... passim

*Playtex Products, Inc. v. Procter & Gamble Co.*,
400 F.3d 901 (Fed. Cir. 2005) .......... 7

*SanDisk Corp. v. Memorex Products, Inc.*,
415 F.3d 1278 (Fed. Cir. 2005) .......... 9

*Saunders Group, Inc. v. Comfortrac, Inc.*,
492 F.3d 1326 (Fed. Cir. 2007) .......... 18

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*,
358 F.3d 870 (Fed. Cir. 2004) .......... 7

*Teleflex, Inc. v. Ficosa North American Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) .......... 7

*Toro Co. v. Deere & Co.*,
355 F.3d 1313 (Fed. Cir. 2004) ........ 18

*Vanguard Products Corp. v. Parker Hannifin Corp.*,
234 F.3d 1370 (Fed. Cir. 2001) ........ 9

*z4 Technologies, Inc. v. Microsoft Corp.*,
507 F.3d 1370 (Fed. Cir. 2007) ........ 9

## TABLE OF EXHIBITS

A. U.S. Patent No. 4,896,499 to Rice, including Certificate of Correction

B. U.S. Patent Reexamination Certificate B1 4,896,499 to Rice

C. April 11, 1989 Office Action, U.S. Patent Application Serial No. 07/251,076

D. July 7, 1989 Amendment and Response to Office Action, U.S. Patent Application Serial No. 07/251,076

E. March 9, 1992 Amendment and Statement Under 37 C.F.R. § 1.510 and § 1.530, U.S. Patent Reexamination Application Serial No. 90/002,663

F. July 15, 1992 Notice of Intent to Issue Reexamination Certificate, U.S. Patent Reexamination Application Serial No. 90/002,663

G. U.S. Patent No. 3,273,340 to Hull

H. U.S. Patent No. 3,486,340 to DuPont et al.

I. *Webster's New Universal Unabridged Dictionary* 387, 650 (2nd ed.1983)

J. *Webster's Ninth New Collegiate Dictionary* 278, 440 (1984)

K. Robert Resnick & David Halliday, *Physics for Students of Science and Engineering Part 1* 490-91 (1962)

## TABLE OF APPENDICES

1. Complete Prosecution History of U.S. Patent Application Serial No. 06/572,548

2. Complete Prosecution History of U.S. Patent Application Serial No. 06/818,472

3. Complete Prosecution History of U.S. Patent Application Serial No. 07/251,076

4. Complete Prosecution History of U.S. Patent Reexamination Application Serial No. 70/002,663

Plaintiff Ivan G. Rice ("Plaintiff") hereby submits his opening claim construction brief pursuant to item 9 of this Court's scheduling Order (Doc. No. 45).

## I. INTRODUCTION

Plaintiff filed this action under 28 U.S.C. § 1498 on March 23, 2005, alleging that Defendant United States ("Defendant") has, without authorization, used the invention defined by claim 1 of Reexamined U.S. Patent No. B1 4,896,499 ("claim 1" and/or "the '499 patent"). The '499 patent is entitled "Compression Intercooled Gas Turbine Combined Cycle." The '499 patent, including its Certificate of Correction, is attached as Exhibit A to this brief. The Reexamination Certificate is attached as Exhibit B to this brief. Additional evidence cited by Plaintiff is attached hereto as Exhibits C-K. The complete file history of the '499 patent is attached hereto as Appendices 1-4.

Following the guidance of the Federal Circuit's *Markman v. Westview Instruments, Inc.* decision, this Court has requested briefing regarding the proper construction of the disputed terms of claim 1. 52 F.3d 967, 979 (Fed. Cir. 1995). Claim 1 is set forth below, with emphasis on the disputed terms:

> 1. In a power producing system comprising a twin spool gas generator and a power turbine, said gas generator having a low pressure compressor driven by a low pressure turbine, a high pressure compressor driven by a high pressure turbine, a combustor positioned between said high pressure compressor and said high pressure turbine, said power turbine positioned downstream from said low pressure turbine, the improvement being characterized in that:
>
> said high and low pressure turbines being axially positioned and independently rotatable for driving said high and low pressure compressors, respectively, by means of concentric coaxial outer and inner shafting, respectively,
>
> said gas generator including at least one ***externally mounted intercooler*** positioned between said low pressure compressor and said high pressure compressor, at least one compressor outlet duct from said low pressure compressor communicating with said intercooler, and at least one return duct from said intercooler communicating with said high pressure compressor,

789069_1

> wherein said compressor outlet and return ducts and ***connections*** between said compressors and said intercooler are provided between said axially positioned low and high pressure compressors for air flow to and from said intercooler in counterflow with coolant,
>
> ***said outlet duct being configured to radially expand said air flow to a low velocity*** and ***said return duct being configured for low radial flow return velocity to said high pressure compressor***,
>
> ***the high pressure compressor having an inlet flow area directly proportional to the outlet flow area of the low pressure compressor, and inversely proportional to the absolute temperature ratio between the high temperature airflow discharged from the low pressure compressor compared to the low temperature air flow from the intercooler passing to the inlet area of the high pressure compressor.***

This brief and accompanying evidence are submitted for the Court's consideration in interpreting the disputed terms from claim 1. A brief overview of the claim 1 invention is first presented. Next, the prosecution history is briefly summarized, followed by the legal standard. Plaintiff's proposed construction of the disputed terms follows, with arguments and particular legal authority where required. Lastly, the agreed constructions of certain terms are set forth.

## II. SUMMARY OF THE ARGUMENT

The terms of claim 1 do not require elaborate construction. The ordinary meaning of each disputed term is readily apparent from the plain language and the context of the terms in claim 1. Each of plaintiff's constructions captures the plain and ordinary meaning, guided by the intrinsic record of the patent. On the other hand, defendant proposes constructions that deviate from the ordinary meaning of the terms.

The intrinsic evidence does not support extraneously narrow limitations. The specification broadly discloses a novel power producing system, without any indication that unclaimed features are essential to the invention.

Furthermore, the prosecution history is consistent with plaintiff's constructions. Certain claim scope was disclaimed with respect to the prior art, and plaintiff's construction captures the meaning of the prosecution statements as they relate to the referenced prior art.

## III. BACKGROUND

### A. The Invention

Plaintiff's invention, defined by claim 1 of the '499 Patent, is a "power producing system comprising a twin spool gas generator and a power turbine." The gas generator includes a low pressure compressor, two specially configured ducts, connections, an intercooler, a high pressure compressor, a combustor, two turbines to drive the respective compressors.

Below, a CAD-rendering of Figure 2 from the '499 Patent shows the various components of claim 1, minus the intercooler and the downstream power turbine.



Air enters the low pressure compressor, where it is compressed. As the air is compressed, its temperature rises. The hot compressed air exits the low pressure compressor at a high velocity. The high velocity, hot, compressed air flows through the outlet duct. The radial portion of the outlet duct expands the hot air and slows it down. The hot air then flows through the intercooler, which cools the air. After exiting the intercooler, the cooled air flows through the return duct. The return duct directs the low velocity, cooled air radially back towards the axis of the gas generator. The return duct then turns the cooled air axially into the high pressure compressor. In the high pressure compressor, the cooled air is compressed further.

After passing through the high pressure compressor, the air flows into the combustor, where it is mixed with fuel and ignited. The resulting hot, expanding gas is directed through the high pressure turbine and then the low pressure turbine. Each compressor turbine is connected by a shaft to its respective compressor. The two shafts are concentric and coaxial, with the low pressure shaft extending through and inside the high pressure shaft. This "twin-spool" configuration allows each compressor/turbine spool to rotate independently of the other, while maintaining an axial flow arrangement. After driving the two compressor turbines, the hot gas is directed through a power turbine, which is connected to an external load such as a ship's propeller or an electric generator.[1]

The novelty of the invention resides primarily in the configuration of the ducting, the intercooler and the flow areas of the two compressors. Twin-spooled engines with intercoolers had been designed before, but none were successful. The inventor identified the problems with these early designs. Specifically, the inventor observed that the axial flow compressors of the

---

[1] In a jet engine, there is no power turbine. Instead, the energy of the combusted gas (after driving the compressor turbines) is used as propulsive thrust. Jet engines involve different engineering considerations as compared to gas turbines for marine or industrial applications. At least one difference is the size and weight constraints inherent in aircraft design.

previous designs utilized high velocity axial air flow through the intercooler that was interposed between the two compressors. That high velocity air flow collided with the intercooler, resulting in wasteful pressure losses and thereby eliminating any potential gain that obtained from cooling the air flow using the intercooler. The inventor solved this problem by providing a specially configured duct from the low pressure compressor that radially expands the compressed air, thus reducing the velocity of the air when entering the intercooler.

As noted, another novel aspect of the invention relates to the annular flow areas of the two compressors. The inventor recognized that the benefit of cooling the air between compressors could be optimized by matching the compressors' relative flow areas according to the decrease in volume of the air. He recognized the thermodynamic principle that the decrease in volume of air would be directly related to the decrease in temperature. Thus, in an intercooled system, the cooled air exiting the intercooler would have less volume—but higher density—than the air entering the intercooler. Utilizing this principle, the claimed invention specifies a low pressure compressor exit flow area that is sized relative to the high pressure compressor entrance flow area. More specifically, the ratio of the compressor flow areas matches the ratio of the absolute temperature of the hot air that can enter the intercooler compared to the absolute temperature of the cooled air that can exit the intercooler. With this matching relationship, the system takes maximum advantage of the thermodynamic benefits gained by intercooling the compressed air.

### B. Prosecution of the '499 Patent

The prosecution of the '499 patent spans three applications and one reexamination. The '499 patent claims priority to Application Serial Number 06/572,548, filed January 20, 1984. Appendix 1. The '548 application issued as U.S. Patent No. 4,592,204.

Application Serial Number 06/818,472 was filed as a divisional of the '548 application.

Appendix 2. Claim 69, which was later amended and ultimately issued as the asserted claim 1, was originally submitted for consideration during prosecution of the '472 application. The '472 application was later abandoned.

Application Serial No. 07/251,076 was filed as a continuation of the '472 application. Appendix 3. During prosecution of the '076 application, claim 69 was rejected over two prior art patents, namely the "Hull" and "DuPont" patents (discussed below). Exh. C, p. 3. In response to this rejection, claim 69 was amended and distinguished over the cited prior art. Exh. D, p. 2, 7-10. Claim 69 and others were then allowed, and the '076 application issued as U.S. Patent No. 4,896,499 on January 30, 1990.

After new prior art was discovered, Application Serial No. 90/002,663 was filed for reexamination of the '499 patent. Appendix 4. In the request for reexamination, certain claims were amended. Of particular relevance here, an additional limitation was added to claim 1. Exh. E, p. 51. The amended claim was allowed over the newly cited prior art, Exh. F, p. 2-3. Reexamination Certificate B1 4,896,499 issued on September 15, 1992.

## IV. LEGAL STANDARD

### A. General Rules For Claim Construction

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995). Claim construction begins with, and remains focused on, the language of the claims. *Biagro W. Sales Inc. v. Grow More Inc.*, 423 F.3d 1296, 1302 (Fed. Cir. 2005); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004). Claim construction entails considering a hierarchy of evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1311-24 (Fed. Cir. 2005) (en banc). These sources are set forth below.

### 1. *Language and Context of the Claim Term*

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (quotations and citations omitted). It is heavily presumed that a claim term conveys its "ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *see also Phillips*, 415 F.3d at 1313-14. The "ordinary and customary meaning" of a claim term is the meaning one of ordinary skill in the relevant art would accord the term at the time the patent application was filed. *Phillips*, 415 F.3d at 1313.

In determining the ordinary and customary meaning of a claim, the Court looks to the words of the claims themselves to define the scope of the patent invention. The claims provide substantial guidance as to the meaning of claim terms. *See Phillips*, 415 F.3d at 1312, 1314; *Bell Atlantic Network Servs., Inc. v. Covad Comms. Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). Furthermore, "the context in which a term is used in the asserted claim can be highly instructive. *Phillips*, 415 F.3d at 1314.

### 2. *Language of the Specification*

The Court should also view the rest of the patent specification as a guide to determine the ordinary and customary meaning of a disputed claim term. *Phillips*, 415 F.3d at 1314. However, the Court must take "extreme care" to avoid imputing limitations from the specification into the claims. *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 908 (Fed. Cir. 2005); *see also, e.g.*, *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002). The specification is generally not limiting because it is the function of the claims, not the specification, to define the scope of patent protection. *Phillips*, 415 F.3d at 1312; *see also SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) ("Specifications

teach. Claims claim.").

As a corollary to this rule, Courts may not interpret claim terms to limit the claims to specific embodiments articulated in the specification. *Phillips*, 415 F.3d at 1323; *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). The claims—not embodiments in the specification—define the scope of patent protection. "[The] preferred embodiment cannot be the only product covered by the claims; if it were, the claims themselves would be unnecessary." *Acumed LLC v. Stryker Corp.*, 483 F.3d. 800, 809 (Fed. Cir. 2007).

### *3. Prosecution History*

The Court should also look to the prosecution history as evidence of how a person of skill in the art would have understood the disputed claim language. *Phillips*, 415 F.3d at 1314. However, the prosecution history often lacks the clarity of the specification and thus is less useful for claim construction. *Id.* at 1317. "[T]he prosecution history may not be used to infer the intentional narrowing of a claim absent the applicant's *clear* disavowal of claim coverage, such as an amendment to overcome a rejection." *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1327 (Fed. Cir. 2003).

### *4. Extrinsic Evidence*

Courts may also consider extrinsic sources of evidence, such as expert testimony, treatises, and dictionaries, to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317. However, the intrinsic evidence of the patent is preferred over extrinsic sources. *Id.*

## B. Other Applicable Rules for Claim Construction

### *1. Prosecution Disclaimer*

The heavy presumption of ordinary and customary meaning may only be overcome if a patent applicant clearly and unmistakably surrenders claim scope during prosecution. *Elbex*

*Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371-72 (Fed. Cir. 2007). Prosecution disclaimer "does not apply where the alleged disavowal is ambiguous; the disavowal must be both *clear and unmistakable* to one of ordinary skill in the art." *Id.* (citations omitted) (emphasis added) ; *see also SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005) (no disclaimer if "a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term"). While claim scope may be clearly and unmistakably surrendered during prosecution, the scope of the disclaimer is determined by not only the actual statements made to the examiner, but also the referenced prior art. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-28 (Fed. Cir. 2003).

### 2. *Construction of Apparatus Claims*

"A novel product the meets the criteria of patentability is not limited to the process by which is was made." *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372-73 (Fed. Cir. 2001). A claim cannot recite both a method and an apparatus. *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1383-84 (Fed. Cir. 2005). The scope of an apparatus claim includes the reasonable capabilities of the accused device. *See z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1370, 1350 (Fed. Cir. 2007).

## V. DISCUSSION

The proper construction of the following five claim terms is disputed:

A. Externally mounted intercooler

B. Said outlet duct being configured to radially expand said air flow to a low velocity

C. Said return duct being configured for low radial flow return velocity to said high pressure compressor

D. Connections

E. The high pressure compressor having an inlet flow area directly proportional to the outlet flow area of the low pressure compressor, and inversely proportional to the absolute temperature ratio between the high temperature airflow discharged from the low pressure compressor compared to the low temperature air flow from the intercooler passing to the inlet area of the high pressure compressor ("the flow areas limitation")

Discussion now turns to the proper construction of each of the five disputed terms.

**A. Externally Mounted Intercooler**

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| *externally mounted intercooler* | An intercooler that is mounted outside the casing of the low pressure compressor and the casing of the high pressure compressor, excluding an intercooler that is mounted in the axial flow path of either compressor. | An intercooler that is mounted separately from and outside of the gas generator casing (the casing containing, among other things, both the low pressure compressor and the high pressure compressor). The claimed intercooler cannot be an annular intercooler. |

Plaintiff proposes defining "externally mounted intercooler" as "*an intercooler that is mounted outside the casing of the low pressure compressor and the casing of the high pressure compressor, excluding an intercooler that is mounted in the axial flow path of either compressor*." The parties agree, in principle, that "externally mounted intercooler" is an intercooler that is mounted "outside of" something else, but they disagree on what that "something" is. The parties also dispute the scope of prosecution disclaimer, i.e., the legal significance of statements made during prosecution to secure allowance over particular prior art. Plaintiff's construction is based on the plain meaning and the context of the claim. It is further supported by the specification and drawings. Plaintiff's construction also properly addresses the prosecution history and the cited prior art for purposes of identifying the scope of the prosecution disclaimer.

The term in question is "externally mounted intercooler." The meaning of "mounted" is not disputed. Nothing in the claim expressly specifies any structure or surface on which the intercooler *must* be "mounted," but only that it be "externally mounted." Based on dictionary definitions, the ordinary meaning of "externally" is "outside of,"[2] and the parties appear to agree with this ordinary meaning. The dispute revolves around the reference point for "externally," *i.e.*, the intercooler must be external to (outside of) what, exactly?

The Federal Circuit in *Phillips* indicated that, to resolve a dispute over the meaning of claim language, the first place to look is the "context" of the claim. 415 F.3d at 1314. Consulting the context of this claim limitation, it is apparent that the intercooler is to be external to the compressors. Claim 1 recites "at least one externally mounted intercooler positioned between said low pressure compressor and said high pressure compressor." Therefore, according to the claim language, the intercooler is positioned physically between the two compressors. Those two compressors provide the most logical reference point for determining whether the intercooler is external or not. That is, in the same way the intercooler is "positioned between" the two compressors, the intercooler is also "external" to those same two compressors.

The remaining claim language also supports this construction and proves that the intercooler *cannot* be separate from the gas generator, as proposed by Defendant. The phrase "said gas generator *including* at least one externally mounted intercooler" (emphasis added) indicates that the intercooler is necessarily part of the gas generator. Therefore, based on the claim language, the externally mounted intercooler is external to the compressors, but not external to (or separate from) the gas generator itself.

---

2 Extrinsic evidence confirms that the intercooler is mounted outside of something. For example, one dictionary defines "externally" as "outwardly; on or from the outside." Exh. I, 650. According to another dictionary, "external" means "of, relating to, or connected with the outside or an outer part." Exh. J, 440. Therefore, the intercooler must be outside something. In the context of claim 1, the intercooler is outside the compressors.

Plaintiff's claim construction is also consistent with the specification. The specification discloses that each compressor has a casing, which provides additional clarity to the claim construction by identifying the casing as the outer surface of each compressor. As seen in Figure 2, the low pressure compressor 24 has an "associated outer casing 72" and the high pressure compressor 44 has an "associated outer casing 78." Ex. A, col. 7, lines 24-29. The casing is essentially the outer surface of the compressor.




Exh. A, FIGURE 2

The intercooler is connected to the ducts 36 and 42. Exh. A, col. 7, lines 32-36. As such, the intercooler is mounted outside the two compressor casings 72 and 78, and is thus "mounted externally" to those compressors.

Based on the arguments made to the Examiner specific to the Hull[3] and DuPont[4] prior art patents, the inventor disclaimed certain subject matter. The issue is the scope of the prosecution disclaimer. Exclusionary statements made during prosecution should be analyzed, not in a vacuum, but in the context of the specific prior art references that were being distinguished. *See Omega Eng'g*, 334 F.3d at 1326-28. According the prosecution arguments and the content of the

---

3 Exh. G, U.S. Patent No. 3,273,340 to Hull.

4 Exh. H, U.S. Patent No. 3,486,340 to DuPont et al.

Hull and DuPont references, the externally mounted intercooler should be construed to exclude an intercooler mounted axially in the flow path of either compressor.

During prosecution, the Examiner rejected claim 1 (then pending as claim 69) as anticipated by either Hull or DuPont. Exh. C, p. 3. In response to this rejection, the inventor amended claim 1 to recite the "externally mounted" limitation for the intercooler, as well as the special configurations for the outlet and return ducts. Exh. D, pp. 2-3.[5] The inventor then argued that the amendments distinguished the claim over Hull and DuPont. *Id.* at pp. 7-10. The parties dispute the scope of the disclaimer created by the amendments and the comments regarding Hull and DuPont.

Hull discloses a multi-spool gas generator, where the discharge air flow from the first compressor 14 is divided into inner and outer flow paths. Exh. G, col. 4, lines 10-37.[6] The inner air flow path is directed axially through additional compressors 17 and 18, while the outer flow path is an axial duct that bypasses the additional compressors. *Id.* A heat exchanger 16 (*i.e.*, intercooler) provides heat transfer between the air in the bypass duct and the air exiting compressor 17. *Id.*

The inventor identified several problems with Hull. The shortcomings of Hull arise from the location of the intercooler 16, which is directly in the axial flow path of both compressors 17 and 18, as seen in Figure 3:

[5] Four limitations were added to claim 1 in the July 7, 1989 Response to Office Action: the "externally mounted" limitation, the "counterflow" limitation (not at issue here), and the two limitations regarding the configuration of the outlet duct and the return duct. With these amendments, claim 1 was allowed.

[6] In Hull, "[t]he compressor 14 actually functions as a fan rather than as a true compressor since it accelerates the motive fluid only and does not reduce the flow area." Exh. G, col. 4, lines 20-22.




Exh. G, HULL, FIGURE 3

The inventor explained the structural flaws in Hull which would cause efficiency problems. "Hull uses annular ducting and intercooler and not separate piping to an externally mounted intercooler. Low pressure drop is necessary and not possible for close approach temperatures in the Hull arrangements." Exh. D, p. 8. The inventor also noted:

> [I]t is commonly known by those knowledgeable in gas turbine design that the exit velocity of an axial flow compressor is typically mach 0.3 which is far too high for a low pressure drop heat exchanger. Pressuredrop [sic] varies as the square of the velocity, and the Hull heat exchanger and ducting pressure losses would be very high and several times the total 3% given as typical for the Applicant's invention.

*Id.* Because both the ducting and the intercooler in Hull are annular, they are aligned along a single axis. Consequently, the compressor 17 of Hull delivers hot compressed air straight to the intercooler at a high velocity. A tremendous loss of pressure results from delivering high velocity air directly to the intercooler. The claim 1 invention solves this problem "with the unique and novel outlet and return ducting to a counterflow externally mounted intercooler." *Id.* Thus, the externally mounted intercooler cannot be construed to include an intercooler mounted in the axial flow path of the compressors, such as the heat exchanger 16 in Hull.

The inventor also distinguished his invention from DuPont on the same grounds. Exh. D, pp. 8-10 DuPont discloses a multi-spool gas generator with a bypass duct. Exh. H, col. 2, lines 5-12. After passing through the fans 17 and 18, the air is divided into an inner duct and an

outer bypass duct. *Id.* As with Hull, the high velocity air leaves the compressor in an axial direction and flows into the intercooler at a high velocity. Specifically, the inner duct feeds air axially to an intercooler 26, which transfers heat from the partially compressed air to the fuel. *Id.* at col. 2, lines 13-33. After being further compressed, the air is again cooled with fuel in intercooler 28. *Id.*




Exh. H, DuPont

According to the inventor, DuPont's flaws are similar to those in Hull:

> [T]he axial flow fan 18 discharge air [is] being fed directly to heat exchanger 26. The air velocity would be too high for a low air side pressure drop heat exchanger—especially with the double pass heat exchanger arrangement used. The fan exit velocity would be about mach 0.3 and much too high. A low velocity of mach less than 0.10 is needed and knowing that pressure drop varies as the square of velocity, the DuPont et al heat exchanger 26 or 28 pressure drop would be several times greater than the projected total 3% of the Applicant's invention.

Exh. D, p. 9. Thus, the inventor distinguished the claimed invention from DuPont on the grounds that the axial air flowing into the heat exchanger 26 would have airflow velocity "*much*

*too high.*" *Id.* (emphasis added). In contrast, the claimed intercooler is fed *low* velocity air from the specially configured radial duct.

Based on the statements made during prosecution regarding the differences between the claimed invention and the Hull and DuPont prior art patents, the claimed externally mounted intercooler should be construed to exclude an intercooler mounted in the axial flow path of either compressor.

**B. Outlet Duct Configured to Radially Expand**

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| *said outlet duct being configured to radially expand said air flow to a low velocity* | The outlet duct being shaped and positioned to cause air flowing away from the axis of the shafting to increase in volume resulting in a decreased air flow velocity. | That portion of the air conduit which directs the air out of the gas generator and which is shaped so as to increase the cross-sectional flow area in a direction generally perpendicular to the axis of the gas generator resulting in a velocity of less than approximately 200 feet per second. |

Plaintiff proposes defining "said outlet duct being configured to radially expand said air flow to a low velocity" as "*the outlet duct being shaped and positioned to cause air flowing away from the axis of the shafting to increase in volume resulting in a decreased air flow velocity.*" The construction of this limitation proposed by Plaintiff is supported by the plain and ordinary meaning of the claim language itself, the specification and drawings, and the prosecution history.

Plaintiff's claim construction defines the word "configured" as "shaped and positioned," which is intended to be the ordinary meaning of the term. Defendant has included "shaped" in its definition so there does not appear to be a substantial dispute as to the meaning of the word

"configured." The dispute appears to lie in the terms "radially expand" and "low velocity." The actual language of the limitation, read in its proper context, provides the most straightforward source for construing this limitation. The specification and prosecution history also support a plain and ordinary meaning.

As claim 1 recites, the outlet duct provides communication for the air flow between the low pressure compressor and the intercooler ("at least one compressor outlet duct from said low pressure compressor communicating with said intercooler"). Accordingly, the exit of the low pressure compressor and the entrance of the intercooler—and the duct that connects them—provide the proper context to give meaning to "radially expand" and "low velocity."

According to the language of the claim itself, it is the "air flow" that is expanding, not the cross-sectional area of the conduit. Furthermore, the air flow is expanding radially. As revealed in the specification, the air exits the low pressure compressor at a very high velocity. "Low-pressure compressor 24 discharges axially at about Mach 0.3 air velocity corresponding to about 400 to 450 ft/sec at the flowing temperature." Exh. A, col. 8, lines 3-5. After exiting the low pressure compressor, the air flow is expanded in the outlet duct. *Id.* at col. 8, lines 2-12. This expansion takes place while the air flow is travelling in a radial direction, with respect to the axis of the gas generator. The expansion of the air flow in a radial direction slows the air down. *Id.* After expansion, the air flow velocity is necessarily and inherently lower than the high velocity of the air flow before expansion. Thus, in this limitation, "low velocity" is naturally and logically understood as a relative term. That is, after radial expansion, the air flow velocity is less than the high velocity of the air flow discharged from the low pressure compressor, before expansion.

The specification confirms that this claim term ("low velocity") refers to the air flow after

it has been expanded and slowed down in the outlet duct. The outlet duct is specifically configured to slow the air flow velocity down. *Id.* at col. 7, lines 37–40 (noting that the "ducting and intercooler arrangement makes it possible to *manage the flow* of the low-density high-volume air to and from the intercooler(s) more efficiently") (emphasis added); *id.* at col. 15, lines 5–8 (describing ducts as having "a generous cross-sectional area to provide a *low velocity* inlet of 50 to 74 ft/sec") (emphasis added). Plaintiff's proposed construction reflects that the function of the outlet duct is to slow the air flow to a low velocity prior to entry into the intercooler.

In addition to a low velocity of 50 to 74 ft/sec, the specification also discloses a specific embodiment where the outlet duct slows the air flow to approximately 200 feet per second. *See id.* at col. 8, lines 3-12 ("The gas velocity exiting diffuser 102 is at about Mach 0.14 corresponding to about 200 ft/sec according to the base temperature involved."); *id.* at col. 15, lines 19-24 ("The straight-wall vaneless diffuser of FIGS. 3 and 6b will only provide an effective area ratio change of about 2 without flow separation and the exit velocity will be about 200 ft/sec resulting in a maximum of some 70 percent velocity pressure recovery when considering the velocity head varies as the square of the velocity.").

However, the Federal Circuit has "repeatedly warned against" limiting claims to specific embodiments. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005). Specifically, where a preferred embodiment disclosed in the specification identifies numeric parameters, it is error to limit the claims to those specific parameters. *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1319-20 (Fed. Cir. 2004). Furthermore, nothing in the '499 patent specification indicates that a low velocity of less than 200 feet per second is an "essential" feature of the claimed invention. *See, e.g., Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1332-33 (Fed. Cir. 2007). In this case, the specification does not justify limiting claim 1 to "less than 200 feet per second."

The prosecution history also supports Plaintiff's claim construction. Specifically, the "low velocity" limitation was characterized as "reduced velocity," which is reflected in Plaintiff's proposed construction. The prosecution history also explains why a low velocity is required for the air flow entering the intercooler.

This limitation was added during prosecution in response to the Hull and DuPont references. *See* Exh. C, p. 3; Exh. D, p.7.[7] The inventor explained that the added limitation provided for "radial flow low velocity exit and return ducting of the compressed air for reduced velocity and lower pressure loss." Exh. D, p. 7. In distinguishing Hull and DuPont, the inventor recognized that the axial flow, low pressure compressor discharge velocity of "mach 0.3" would be unacceptable for a useful, low pressure drop intercooler. *See id.* at p. 8, 9 (noting the air flow velocity entering the Hull and DuPont intercoolers would be "too high"). Thus, the outlet duct is desiged to slow the air down before the air enters the intercooler, allowing for cooling of the air flow without significant pressure loss. The prosecution history confirms that the duct was designed for "reduced velocity," *i.e.*, decreased velocity, as reflected in Plaintiff's construction.

**C. Return Duct Configured For Low Radial Flow Velocity**

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| *said return duct being configured for low radial flow return velocity to said high pressure compressor* | The return duct being shaped and positioned to result in a velocity of air flowing toward the axis of the shafting that is lower than the velocity of that air when it enters the high pressure compressor. | That portion of the air conduit which directs the air from the intercooler to the high pressure compressor in a direction generally perpendicular to the axis of the gas generator into the gas generator and which maintains the air flow at a velocity of less than approximately 200 feet per second. |

7 As discussed previously, after being changed to include the amendments for the specially configured ducts, the "externally mounted" limitation, and the "counterflow" limitation, claim 1 was allowed.

Plaintiff proposes defining "said return duct being configured for low radial flow return velocity to said high pressure compressor" as "*the return duct being shaped and positioned to result in a velocity of air flowing toward the axis of the shafting that is lower than the velocity of that air when it enters the high pressure compressor.*" As with the outlet duct, Plaintiff's construction is based on the ordinary meaning, guided by the context of the language in claim 1, as well as the specification and prosecution history.

The use of the word "radial" to describe the direction of the air flow provides a contrast with the air flow having an axial direction. In this term, the low velocity refers to the radial component of the air flow in the return duct. Therefore, "low *radial* flow return velocity" is a relative term, in contrast to both the axial direction of the air flow and the higher velocity of the axial air flow. The radial component of the air flow in the return duct is required to have a velocity that is lower than the axial component of the air flow in the return duct.

The context of the limitation also supports Plaintiff's proposed claim construction. In claim 1, the externally mounted intercooler is mounted outside the axially positioned high pressure compressor. The return duct is positioned between those two components. The return duct conveys the air from the external intercooler. The air flows *radially* back to the high pressure compressor. Because the high pressure compressor is axially positioned, the return duct must naturally change directions from *radial* to *axial*. Accordingly, "low radial flow return velocity" means the radial component of air flow in the return duct is lower than the high velocity air flow delivered to the high pressure compressor.

## D. Connections

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| *Connections* | Any structures (such as flanges) that connect the outlet and return ducts to the intercooler and permit air flow to and from the intercooler. | Piping and the associated flanges which deliver air from the compressor outlet duct to the externally mounted intercooler and from the externally mounted intercooler to the compressor return duct. |

Plaintiff proposes defining "connections" as "*any structures (such as flanges") that connect the outlet and return ducts to the intercooler and permit air flow to and from the intercooler*." This definition is supported by the ordinary meaning of the term, the context of the term in the claim, the specification and the file history.

The ordinary meaning of "connection" is something that connects.[8] The term "connections" appears once in claim 1, in the context of the outlet and return ducts, the compressors and the intercooler. Specifically, both ducts and the connections are recited as being provided "for air flow to and from said intercooler in counterflow with said coolant." Unlike the ducts, the connections are not described as "communicating" with the intercooler. Rather, they are described as being provided "for air flow." Therefore, in the context of claim 1, the "connections" should be interpreted as functioning jointly with the ducts to provide for the air flow to and from the intercooler. They do this by connecting the outlet and return ducts to the intercooler. Any structure that connects the ducts to the intercooler, so that there is air flow, would meet this requirement.

---

[8] One dictionary defines "connection" as "something that connects: LINK ‹a loose ~ in the wiring›." Webster's Ninth New Collegiate Dictionary 278 (1984). Another dictionary defines "connection" as "that which connects or unites; a tie; a bond; means of joining." Webster's New Universal Unabridged Dictionary 387 (1983).

The specification refers twice to "connections." In each case the connections are specifically "flange connections." For example, with reference to Figures 3 and 6, the specification identifies a "flange connection" 190. Exh. A, col. 12, lines 22-24. Also, the specification refers to certain prior art, aero-derivative gas generators as having "a coupling flange connection" on the inner coaxial shaft. *Id.* at col. 13, lines 20-25. Thus, by referring to "flange connections," the specification identifies a flange as a specific type of "connection." Because flanges are structures specifically designed to connect two structures, it is entirely appropriate to refer to a flange as a connection. Further, Figure 3 shows flanges at the upper edge of the ducts 36, 39. The most reasonable function of such flanges is to connect the ducts to the intercooler. Therefore, the specification, including the drawings, is fully consistent with Plaintiff's proposed claim construction.

The prosecution history provides additional support for Plaintiff's construction, proving that the "connections" are structures for connecting the ducts to the intercooler, rather than additional piping (as proposed by Defendant). In referring to one possible benefit of the duct and intercooler arrangement, the inventor noted "the radial ducting to and from the intercooler(s) *with connection flanges* makes it possible to disconnect the gas generator from the intercooler." Exh. D, p. 10-11 (emphasis added). The "connection flanges" in that statement corresponds to the phrase "flange connections" in the specification. In either case, because flanges are structures that serve the purpose of connecting two structures, the most natural and straightforward definition of connections is something that connects.

## E. The Flow Areas Limitation

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| *the high pressure compressor having an inlet flow area directly proportional to the outlet flow area of the low pressure compressor, and inversely proportional to the absolute temperature ratio between the high temperature airflow discharged from the low pressure compressor compared to the low temperature air flow from the intercooler passing to the inlet area of the high pressure compressor* | The ratio of the low pressure compressor outlet flow area and the high pressure compressor inlet flow area matches the ratio of the absolute temperature of the compressed air at the respective flow areas while the system is producing power, which can be stated mathematically as $T_{LPC}/T_{HPC} = A_{LPC}/A_{HPC}$. | This phrase is a design rule applied to optimize the cross-sectional area of the air flow inlet of the high pressure compressor (HPC) in relation to the cross-sectional area of the air flow outlet of the low pressure compressor (LPC) for a single, particular predetermined operating condition (the design point) of the intercooler (1) by having the areas increase or decrease together on a constant ratio basis between them and (2) by having the cross-sectional area of the. air flow inlet of the high pressure compressor also increase or decrease inversely to the ratio of the absolute temperature of the air flow at the cross-sectional area of the air flow outlet of the low pressure compressor divided by the absolute temperature of the air flow at the cross-sectional area of the air flow inlet of the high pressure compressor (i.e., the area increases as the ratio gets smaller and decreases as the ratio gets larger) such that the expression $T_{LPC}/T_{HPC} = A_{LPC}/A_{HPC}$ is satisfied. The claim does not cover an apparatus in which the low pressure compressor and high pressure compressor matching relationship is achieved by way of changing a compressor speed or by changing the velocity of the air flow through the compressors. |

Plaintiff proposes defining this limitation (the flow areas limitation) as "*the ratio of the low pressure compressor outlet flow area and the high pressure compressor inlet flow area matches the ratio of the absolute temperature of the compressed air at the respective flow areas while the system is producing power, which can be stated mathematically as* $T_{LPC}/T_{HPC} = A_{LPC}/A_{HPC}$." Fundamentally, plaintiff's proposed claim construction is derived from the actual words of the claim, interpreted in their proper context, and as part of an apparatus claim. The proposed construction is also supported by the other intrinsic evidence, namely, the specification, prosecution history and pertinent prior art.

Plaintiff's construction is driven by the plain meaning of the words themselves, in their proper context. The meanings of certain phrases in the limitation are not disputed. For example, the terms "high pressure compressor having an inlet flow area" and "outlet flow area of the low pressure compressor" are not disputed. Indeed, the parties have each referred to those flow areas as $A_{HPC}$ and $A_{LPC}$ respectively. Also, both parties have incorporated the mathematical equation $T_{LPC}/T_{HPC} = A_{LPC}/A_{HPC}$ into their respective claim constructions.

According to claim 1, the flow area of the high pressure compressor (HPC) is recited as being "directly proportional" to the flow area of the low pressure compressor (LPC). Also, the same flow area of the high pressure compressor (HPC) is recited as being "inversely proportional" to an absolute temperature ratio (discussed below).[9]

The context of "directly proportional" and "inversely proportional" within the claim itself aids in the construction of this particular limitation. For example, in context, the terms "directly

---

[9] Rather than defining those terms as a reference to the act of modifying the relative sizes of compressor flow areas, as proposed by Defendant, the construction proposed by Plaintiff defines them in terms of the "matching relationship" between each of the compressor flow areas and the absolute temperature ratio. As discussed below, the term "matching relationship" was expressly used during prosecution by both the inventor and the patent examiner.

proportional" and "inversely proportional" identify a precise relationship between four quantities:

- the inlet flow area of the high pressure compressor ($A_{HPC}$);
- the outlet flow area of the low pressure compressor ($A_{LPC}$);
- the high temperature airflow discharged from the low pressure compressor ($T_{LPC}$); and
- the low temperature air flow from the intercooler passing to the inlet area of the high pressure compressor ($T_{HPC}$).

First, the inlet flow area of the high pressure compressor ($A_{HPC}$) is recited as being "directly proportional" to the outlet flow area of the low pressure compressor ($A_{LPC}$). Mathematically, this direct proportionality can be expressed simply as:

$$A_{HPC} \propto A_{LPC} .$$

Second, the same inlet flow area of the high pressure is recited as being "inversely proportional" to the absolute temperature ratio of the high temperature airflow discharged from the low pressure compressor ($T_{LPC}$) compared to the low temperature air flow from the intercooler passing to the inlet area of the high pressure compressor ($T_{HPC}$). This inverse proportionality can also be expressed mathematically as:

$$A_{HPC} \propto \frac{1}{(T_{LPC} / T_{HPC})} .$$

Significantly, the two proportionalities are part of the same expression and, according to the claim language, exist simultaneously. Therefore, it is appropriate to read them together.[10] By reading the two proportionalities together, each proportionality serves as a proportionality

[10] The behavior of gases is often described in terms of direct and inverse proportions, which are then combined to form an equality. *See, e.g.*, Exh. K.

"factor" or "constant" for the other proportionality. Moreover, the flow areas ($A_{LPC}$ and $A_{HPC}$) are numbers with dimensions; that is, they inherently have length (inches or feet). In contrast, the absolute temperature ratio is a "dimensionless" number. But the combination of the two proportionalities results in the following equality, and is expressed in the appropriate length dimensions (inches or feet):

$$A_{HPC} = \frac{A_{LPC}}{(T_{LPC} / T_{HPC})},$$

which can also be expressed as:

$$A_{LPC} / A_{HPC} = T_{HPC} / T_{LPC}.$$

By expressing the compressor flow areas and the respective temperatures as dimensionless ratios, the compressor flow areas can easily be calculated and matched to the temperature drop across the intercooler.

Because the claim is an apparatus claim, the subject limitation needs to be construed with reference to a structure and its capabilities. The compressor areas ($A_{LPC}$ and $A_{HPC}$) are fixed and have concrete, knowable values (*e.g.* certain number of feet or inches). While compressor flow areas are fixed quantities, temperatures are inherently variable. When the power producing system is turned off, for example, there is no "air flow" at all, much less a "high temperature" or a "low temperature." Furthermore, during operation of the system, the temperatures will vary, depending not only on the ambient conditions but the desired operation of the system, *e.g.*, power output.

Because claim 1 is an apparatus claim, each of the temperature limitations should be interpreted in terms of the structures to which they correspond.[11] The temperatures each describe

[11] The temperature terms were not identified by the parties as disputed. However, defining the temperature terms within the context of the flow areas limitation may be useful to the factual inquiry of infringement.

a particular air flow; each term also refers to a particular structure or set of structures. The "high temperature" term is used in the context of one structure, i.e., the low pressure compressor. The "low temperature" term is used in the context of two structures, i.e., the intercooler and the high pressure compressor. Accordingly, the phrase "high temperature airflow discharged from the low pressure compressor" can be construed to mean "high temperature for air flow that the low pressure compressor is capable of discharging." Similarly, the phrase "low temperature air flow from the intercooler passing to the inlet area of the high pressure compressor" can be construed to mean "low temperature for air flow that the intercooler is capable of providing to the high pressure compressor."

The specification is consistent with the plaintiff's construction. The specification discloses that the invention has a low pressure compressor with a diameter that is larger than the diameter of the high pressure compressor. See, e.g., Exh A, col. 4, lines 42-48 and col. 9, lines 27-26. To enable persons skilled in the art to make and use the invention, the inventor recommended using the principles of the invention to modify any one of a number of existing jet engines. See, e.g., Exh A, col. 1, line 61 through col. 2, line 1; col. 2, lines 55-62 and col. 3, lines 42-54.

When the subject limitation was added to the claim during reexamination, the inventor cited to the specification, which he said explained the benefits of the "matching relationship" between the flow areas and temperature ratio. Exh. E, p. 4-5. According to the inventor, the specification explains that this matching relationship is "governed by Boyle's Law,"[12] and "satisfying this relationship significantly increases the efficiency of the power producing

---

[12] Boyle's Law is a specific case of the more generalized Ideal Gas Law. A person of ordinary skill in the art would understand that a reference to Boyle's Law includes the basic relationships between pressure, volume and temperature in an ideal gas.

system." *Id.* Therefore, the inventor identified the portion of the specification that exemplified this "matching relationship."

In one embodiment, the low pressure compressor "pitch-line radius"[13] of the invention is significantly larger than that of the high pressure compressor. *See* Exh. A, col. 8, line 29 – col. 10, line 32. The inventor explains how, in certain embodiments, the difference in the "pitch-line radius" of the two compressors could be modified. *See, e.g., id.* at col. 9, line 27-45 (noting that an increase in pressure would result in higher temperature air flow delivered to the intercooler for cooling, allowing for a larger low pressure compressor). Thus, one feature of the invention is the significant difference in the flow areas of the two compressors. This optimized flow area ratio is determined by the absolute temperature ratio:

> The added low-pressure compressor 24 pitch-line radius, r, FIG.2, *made possible by the cooler and more dense air to the high-pressure compressor* 44 provides the needed radial space and therefore makes it possible to exit the low-pressure compressor 24 hot air, diffuse the hot air and return the cooled air to the high pressure compressor 44 efficiently and with low-pressure loss and at the same time retain the coaxial shafting and unitized single-unit modular construction of gas generator 20.

*Id.* at col. 8, lines 29-38 (emphasis added). Thus, the flow area of the low pressure compressor was designed to be substantially larger than the flow area of the high pressure compressor, made possible by cooling the air flow, i.e., increasing its density.

The specification refers to Boyle's Law to further explain the basis for the different flow areas:

> The thermodynamic explanation of the increase in radius, r, will be discussed as follows: The high-pressure compressor 44 running at a constant RPM has an inlet

13 "Pitch-line radius" refers to the mean radius of the compressor flow area annulus, where half of the flow area is outside and half the flow area is inside. Accordingly, one skilled in the art would understand that the "pitch-line radius" of a compressor is a useful surrogate for the compressor's flow area.

> volume flow that remains practically constant, for varying conditions of inlet pressure and temperature, that is changes in its inlet density. The air that is compressed by the low-pressure compressor 24 is cooled before it is admitted to the inlet of the high-pressure compressor 44 and *as a result the density is increased according to Boyles Law* given as follows:
>
> $$PV = WRT$$
>
> where P is the absolute pressure, V is the volume, W is the weight flow, R is the gas constant and T is the absolute temperature.

*Id.* at col. 9, lines 1–15 (emphasis added). The increased density of the air flow corresponds to the decrease in absolute temperature, which in turn corresponds to a decrease in volume. In the context of that equation, the change in absolute temperature quantifies the change in volume. Accordingly, the flow areas limitation could be quantified by considering a particular, predetermined high temperature of air flow entering the intercooler, and a particular, predetermined low temperature of air flow exiting the intercooler. The inventor recognized that matching the compressor flow areas to this ratio of absolute temperatures would optimize the advantage gained by intercooling.

Plaintiff's definition is confirmed by the prosecution history. To distinguish the claim 1 invention over certain prior art, the inventor added the flow areas limitation to claim 1 during re-examination. The inventor then addressed the patentability of the claim based on the limitation. He made three statements to support his view that the limitation was not suggested by the prior art and was therefore patentable, namely:

- The [prior art] references do not suggest, however, that the high pressure compressor have an inlet flow area proportional to the outlet flow area of the high pressure compressor, and inversely proportional to the absolute temperature ratio between the air discharged from the low pressure compressor compared to the air passing from the intercooler to the high pressure compressor. Exh. E, p. 4.

- The specification at Col. 8:29, and particularly Col. 9:1 through Col. 10:55, describe the *significant benefits* which will be obtained by the power producing system of the present invention *when the inlet flow area to the high pressure compressor is matched to the conditions of the air flows exiting the low pressure compressor. Id.* (emphasis added).

- *As explained by the specification, this matching relationship according to the present invention is governed by Boyles Law, and satisfying this relationship significantly increases the efficiency of the power producing system. Id.* at pp. 4-5 (emphasis added).

Those statements confirm that the subject limitation is necessarily a "matching relationship," and that it is "governed by Boyle's Law." Moreover, this discussion also confirms that the inventor did not limit the scope of the invention to the disclosure in column 9 of the specification. Rather, the inventor stated that the specification described the benefits resulting from a system having the claimed matching relationship.

In allowing claim 1 with this new language, the Examiner agreed that the flow areas limitation identified a "specific relationship."

> In addition to the limitations set forth in the original claims, the present claims all set forth *a specific relationship* between the inlet flow area of the high pressure compressor, the outlet flow area of the low pressure compressor, and the air temperatures ratio across the intercooler.

Exh. F, p. 2 (emphasis added). Plaintiff's construction concisely describes this specific matching relationship.

## F. Agreed Terms

The parties have agreed on the proper construction of the following terms from claim 1:

**Power turbine**—A turbine through which the energy of the high temperature and high pressure gas in excess of that energy required by the compressor turbines is

converted into useful work.

**Intercooler—**A heat exchanger located in the flow path of the air between the low pressure compressor and the high pressure compressor through which the partially compressed air is cooled.

The parties respectfully request that the Court enter an order construing the above terms according to the agreed constructions.

## VI. CONCLUSION AND PRAYER FOR RELIEF

Based on the foregoing, Plaintiff Ivan G. Rice respectfully requests that the Court enter an Order construing the disputed terms in accordance with his proposed constructions.

Respectfully submitted,

Date: May 19, 2008

s/ Douglas H. Elliott
DOUGLAS H. ELLIOTT
Lead Attorney
Patterson & Sheridan, LLP
3040 Post Oak Blvd., Suite 1500
Houston, Texas 77056
Tel (713) 623-4844
Fax (713) 623-4846
delliott@pattersonsheridan.com

*Attorneys for Plaintiff Ivan G. Rice*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served on the parties listed below, in the manner indicated, on this 19th day May, 2008:

***Via the Court's CM/ECF electronic service procedures:***

Ken B. Barrett, Esq.
Civil Division - Commercial Litigation Branch
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW, Room 11122
Washington, D.C. 20005
Fax: (202) 307-0345
E-mail: ken.barrett@usdoj.gov

*Counsel for The United States of America*

***Via email:***

Constance S. Huttner, Esq.
BUCHANAN, INGERSOLL & ROONEY, PC
One Chase Manhattan Plaza, 35th Floor
New York, NY 10005-1417
Fax: (212) 440-4401
E-mail: constance.huttner@bipc.com

*Counsel for Honeywell International Inc.*
*(Interested Party)*

***Via the Court's CM/ECF electronic service procedures:***

Richard E. Rice, Esq.
OLIFF & BERRIDGE, PLC
277 South Washington Street, Suite 500
Alexandria, VA 22314
Fax: (703) 836-2787
E-mail: rrice@oliff.com

*Counsel for Rolls-Royce PLC*
*(Interested Party)*

s/ Douglas H. Elliott
Douglas H. Elliott