**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| IVAN G. RICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05-187C |
| v. | ) | |
| | ) | Senior Judge James F. Merow |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**THE UNITED STATES' CLAIM CONSTRUCTION BRIEF**

GREGORY G. KATSAS
Acting Assistant Attorney General

JOHN FARGO
Director

KEN B. BARRETT
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530
Phone: (202) 307-0343
Facsimile: (202) 307-0345

June 9, 2008

Attorneys for the United States

# TABLE OF CONTENTS

TABLE OF CONTENTS FOR THE APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. BACKGROUND OF THE TECHNOLOGY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. THE LAW OF CLAIM CONSTRUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV. THE COURT SHOULD ADOPT THE GOVERNMENT'S PROPOSED CONSTRUCTIONS OF THE DISPUTED CLAIM TERMS AND PHRASES. . . . . . . . . 7

A. "externally mounted intercooler". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B. "said outlet duct being configured to radially expand said air flow to a low velocity". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

C. "said return duct being configured for low radial flow return velocity to said high pressure compressor". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

D. "connections ". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

E. "high pressure compressor having an inlet flow area directly proportional to the outlet flow area of the low pressure compressor, and inversely proportional to the absolute temperature ratio between the high temperature air flow discharged from the low pressure compressor compared to the low temperature air flow from the intercooler passing to the inlet area of the high pressure compressor". . . . . . . . . 25

V. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF CONTENTS FOR THE APPENDIX

A. U.S. Patent No. B1 4,896,499 to Rice. . . . . DA1

B. Amendment dated July 25, 1985 .. . . . . DA27

C. Amendment dated July 9, 1987 .. . . . . DA40

D. Office Action mailed April 11, 1989, with attached Notice of References Cited . . . DA53

E. Amendment and Response filed July 7, 1989 . . . . . DA60

F. Amendment and Statement Under 37 C.F.R. § 1.510 and § 1.530 dated March 9, 1992 . . . . . DA72

G. U.S. Patent No. 3,273,340 to Hull . . . . . DA86

H. U.S. Patent No. 3,486,340 to DuPont . . . . . DA91

I. A. W. Judge, Gas Turbines for Aircraft, Chapman & Hall Ltd., London, England, (1958), pp. 105-106 . . . . . DA94

J. T. L. Bowen and J. C. Ness, "Regenerated Marine Gas Turbines, Part I: Cycle Selection and Performance Estimation," ASME Paper No. 82-GT-306 (1982) . . . . . DA97

K. E. R. Quandt, Jr., J. E. Baskerville and M. R. Donovan, "Future Propulsion Machinery Technology for Gas Turbine Powered Frigates, Destroyers, and Cruisers," ASNE Symposium-1982, (1982), pp. 321-59, 362-77 . . . . . DA109

# TABLE OF AUTHORITIES

## CASES

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003). . . . . . . . . . 5-6

*Autogiro Co. of Am. v. United States*,
384 F.2d 391 (Ct. Cl. 1967). . . . . . . . . . 18, 21

*Chef America, Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004). . . . . . . . . . 18, 21

*Computer Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008). . . . . . . . . . 6, 10, 16, 30

*Fin Control Systems Pty, Ltd. v. OAM, Inc.*,
265 F.3d 1311 (Fed. Cir. 2001). . . . . . . . . . 19

*Finisar Corp. v. DirecTV Group, Inc.*,
523 F.3d 1323 (Fed. Cir. 2008). . . . . . . . . . 6-7

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
381 F.3d 1111 (Fed. Cir. 2004). . . . . . . . . . 5, 18

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
442 F.3d 1331 (Fed. Cir. 2006). . . . . . . . . . 5, 8, 17

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005). . . . . . . . . . 4-6, 13, 17

*Rice v. Honeywell Int'l, Inc.*,
494 F. Supp. 2d 487 (E.D. Tex. 2007). . . . . . . . . . 2, 26, 31-32

*Rice v. Honeywell Int'l, Inc.*,
No. Civ.A. 6:05CV330, 2006 WL 3420247 (E.D. Tex. Nov. 21, 2006). . . . . . 2, 13, 16, 26

*Saunders Group, Inc. v. Comfortrac, Inc.*,
492 F.3d 1326 (Fed. Cir. 2007). . . . . . . . . . 18

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
511 F.3d 1132 (Fed. Cir. 2007). . . . . . . . . . 14, 17

*Toro Co. v Deere & Co.*,
355 F.3d 1313 (Fed. Cir. 2004). . . . . . . . . . 17

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
442 F.3d 1322 (Fed. Cir. 2006). . . . . . . . . . 31

*z4 Techs., Inc. v. Microsoft Corp.*,
507 F.3d 1340 (Fed. Cir. 2007)) . . . . . . . . . . 30

*Zoltek Corp. v. United States*,
442 F.3d 1345 (Fed. Cir. 2006) .. . . . . . . . . . 1

STATUTES

28 U.S.C. § 1498(a). . . . . . . . . . 1

35 U.S.C. 112 ¶ 1 . . . . . . . . . . 6

# THE UNITED STATES' CLAIM CONSTRUCTION BRIEF

Pursuant to paragraph 10 of the Scheduling Order filed January 7, 2008, and paragraph 12(d)(ii) of the Chief Judge's "Special Procedures Order for Cases Under 28 U.S.C. § 1498(a) (Revised August 17, 2007)," Defendant, the United States, hereby submits its claim construction brief and responds to Plaintiff's Opening Claim Construction Brief filed May 19, 2008 (Pl.'s Cl. Const. Br.).

## I. INTRODUCTION

This is a suit brought under 28 U.S.C. § 1498(a) by Ivan G. Rice for the alleged unauthorized use and/or manufacture by or for the United States Navy of a patented power producing system.[1] Mr. Rice alleges that the Navy's Intercooled Recuperated (ICR) Gas Turbine Engine System, which is also known as the WR-21 engine, is covered by the asserted claim 1 of U.S. Patent No. B1 4,896,499 (the '499 patent). First Amended Compl. (Document No. 5), ¶¶ 7, 9. Plaintiff alleges that the assembly and operation associated with the single test of the WR-21 engine in Philadelphia in 1999 constitutes an unauthorized use or manufacture of a claimed invention. *See id.*, ¶¶ 9, 10. In a parallel proceeding, Mr. Rice sued two of the government's suppliers, Honeywell International and Rolls-Royce, in the United States District Court for the Eastern District of Texas for patent infringement concerning the same '499 patent and the WR-21 engines made for British Royal Navy. *See* Plaintiff Rice's Unopposed Motion to Stay Proceedings filed January 4, 2006 (Document No. 26) at 2. This Court stayed further

[1]Plaintiff's First Amended Complaint also contains a second count asserting that the government's alleged "infringing and inducing infringement of claim 1" constitutes a Fifth Amendment taking. First Amended Compl., ¶ 13. Allegations of patent infringement by the government do not constitute a Fifth Amendment takings claim. *Zoltek Corp. v. United States*, 442 F.3d 1345, 1353 (Fed. Cir. 2006). Plaintiff's counsel has indicated that plaintiff will not pursue the Fifth Amendment takings count.

proceedings pending resolution of the Texas action. Order filed March 7, 2006 (Document No. 36). The Magistrate Judge construed certain claim terms and phrases, *Rice v. Honeywell Int'l, Inc.*, No. Civ.A. 6:05CV330, 2006 WL 3420247 (E.D. Tex. Nov. 21, 2006), and the District Court subsequently granted summary judgment of non-infringement, *Rice v. Honeywell Int'l, Inc.*, 494 F. Supp. 2d 487 (E.D. Tex. 2007).[2] Thereafter, Mr. Rice chose to continue his suit against the government in this Court. The issue of the proper construction of the asserted claim is now before the Court.

## II. BACKGROUND OF THE TECHNOLOGY

The asserted patent claim pertains to a gas turbine engine of a particular and specific design. Defendant's Appendix (DA) at 24, col. 4, line 38 - DA25, col. 5, line3; *see also* DA16, col. 15, lines 53-60 (only "the addition and arrangement of" certain components are regarded as new). Gas turbines are commonly known for their use as aircraft jet engines, but are also used for marine ship propulsion and to drive equipment such as electrical generators. *See* DA9, col. 1, lines 38-46, 61-68; DA97 [G001171]. The British Royal Navy began using gas turbines for combat ship propulsion in the 1960s, and the United States Navy soon followed. DA113-14 [G001237-38].

A gas turbine draws in and compresses air, burns that air with fuel, and then uses the combustion products to spin a turbine which, in turn, drives the compressor. *See* DA92, col. 1, lines 47-54 (DuPont). The remaining energy of the high temperature, high pressure gas may spin

---

[2]Mr. Rice subsequently settled with Rolls-Royce during the appeal from the District Court's decision. Joint Status Report filed January 4, 2008 (Document No. 44), at 2. Mr. Rice had settled with Honeywell at an earlier stage of the District Court proceedings. *See Rice v. Honeywell Int'l, Inc.*, No. Civ.A. 6:05CV330 (E.D. Tex. July 5, 2006) (Document No. 85) (Consent Judgment Order).

a power turbine, which converts the energy into useful work. *See* Joint Claim Construction Statement (JCCS) (Document No. 52) at 1. The section of the gas turbine that produces the high temperature, high pressure gas for the power turbine is known as the gas generator. *See* DA99 [G001173]. A twin-spool, or dual spool, gas generator has two compressors and two corresponding turbines. *See id.*

Gas turbines may also utilize an intercooler. An intercooler is a heat exchanger located between compressor stages through which the partially compressed air is cooled. *See* JCCS at 1. The use of an intercooler was, at the time of the patent application, a well known way to improve gas turbine thermal efficiency. *See* DA100 [G001174]; *cf.* DA10, col. 3, lines 23-25 (the ‘499 patent admitting that “[i]ntercooling has been used for many years with compression of air and other gaseous fluids to reduce the power required for compression.”). The use of intercoolers in gas turbines was known in the art at least as early as the 1950s. *See, e.g.,* DA94-95 [G000693-94]. Persons in the art knew that a low air flow velocity from the compressor to the intercooler was desirable in order to minimize the pressure losses. *Cf.* DA67 [G000703].

The patent describes the modification of existing aircraft-derivative engines for intercooling. *See* DA9, col. 1, line 61 - col. 2, line 3. Plaintiff seeks to improve upon known gas turbines by utilizing purportedly “unique and novel outlet and return ducting to a counterflow externally mounted intercooler,” DA67 [G000703], and by utilizing a specific matching relationship for the air flow conditions across the intercooler, DA83 [G000854]. The asserted claim 1 of the ‘499 patent, as amended during reexamination and as corrected by a Certificate of Correction and with the disputed terms and phrases underlined, reads as follows:

> 1. In a power producing system comprising a twin spool gas generator and a power turbine, said gas generator having a low pressure compressor driven by a low pressure turbine, a high pressure compressor driven by a high pressure turbine, a combustor positioned between said high pressure compressor and said high pressure turbine, said power turbine positioned downstream from said low pressure turbine, the improvement being characterized in that:
>
> said high and low pressure turbines being axially positioned and independently rotatable for driving said high and low pressure compressors, respectively, by means of concentric coaxial outer and inner shafting, respectively,
>
> said gas generator including at least one externally mounted intercooler positioned between said low pressure compressor and said high pressure compressor, at least one compressor outlet duct from said low pressure compressor communicating with said intercooler, and at least one return duct from said intercooler communicating with said high pressure compressor,
>
> wherein said compressor outlet and return ducts and connections between said compressors and said intercooler are provided between said axially positioned low and high pressure compressors for air flow to and from said intercooler in counterflow with coolant,
>
> said outlet duct being configured to radially expand said air flow to a low velocity and
>
> said return duct being configured for low radial flow return velocity to said high pressure compressor,
>
> the high pressure compressor having an inlet flow area directly proportional to the outlet flow area of the low pressure compressor, and inversely proportional to the absolute temperature ratio between the high temperature air flow discharged from the low pressure compressor compared to the low temperature air flow from the intercooler passing to the inlet area of the high pressure compressor.

DA24, col. 4, line 38 - DA25, col. 5, line 39 (emphasis in original omitted); DA26 (Certificate of Correction).

## III. THE LAW OF CLAIM CONSTRUCTION

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (citations omitted). Claim construction begins with the language

of the claims themselves. *See id.* "[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Id.* (citations omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313 (citations omitted).

"Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.' … Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

"[C]laims 'must be read in view of the specification, of which they are a part.' … [T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (citations omitted).

The scope of the claimed invention is constrained by the inventor's disclosure in the specification. "The patent system is based on the proposition that claims cover only the invented subject matter." *Phillips* at 1321. "[T]he role of the specification is to describe and enable the invention. In turn, the claims cannot be of broader scope than the invention that is set forth in the specification." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) (citing *Phillips,* 415 F.3d at 1321); *see also Amgen Inc. v. Hoechst Marion Roussel, Inc.*,

314 F.3d 1313, 1330 (Fed. Cir. 2003) ("The purpose of the written description requirement [of 35 U.S.C. 112 ¶ 1] is to prevent an applicant from later asserting that he invented that which he did not[.]"). Thus, fairness to all parties dictates that the claims be construed to cover that which the applicant disclosed as his invention, but not beyond.

The Court should consult the prosecution history, if in evidence, in performing its claim construction analysis. *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* "The doctrine of prosecution disclaimer 'protects the public's reliance on definitive statements made during prosecution' by 'precluding patentees from recapturing through claim interpretation specific meanings [clearly and unmistakably] disclaimed during prosecution.'" *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-75 (Fed. Cir. 2008) (citations omitted). A patentee disavows claim scope "by clearly characterizing the invention in a way to try to overcome rejections based on prior art." *Id.* at 1374 (citations omitted).

The Court may also consider extrinsic evidence, which is that evidence outside of the claims, specification and prosecution history. *Phillips*, 415 F.3d at 1317. However, the Federal Circuit has "explained that [the extrinsic evidence] is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (citations and internal quotations omitted).

It is appropriate for this Court to consult the analysis of the same claim performed by another court. *See Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008)

("In the interest of uniformity and correctness, this court consults the claim analysis of different district courts on the identical terms in the context of the same patent.")

## IV. THE COURT SHOULD ADOPT THE GOVERNMENT'S PROPOSED CONSTRUCTIONS OF THE DISPUTED CLAIM TERMS AND PHRASES

### A. "externally mounted intercooler"

| The Government's Proposed Construction |
| --- |
| An intercooler that is mounted separately from and outside of the gas generator casing (the casing containing, among other things, both the low pressure compressor and the high pressure compressor). The claimed intercooler cannot be an annular intercooler. |

The parties' primary dispute regarding this term concerns the location of the intercooler with respect to the gas generator casing. The government contends that the intercooler must be mounted outside of the gas generator casing. Plaintiff, however, argues that the claimed "externally mounted intercooler" may be located inside the gas generator casing. Pl.'s Cl. Const. Br. at 11. Plaintiff erroneously contends that "the externally mounted intercooler is external to the compressors, but not external to (or separate from) the gas generator." *Id.*

This limitation is found in the phrase "said gas generator including at least one <u>externally mounted intercooler</u> positioned between said low pressure compressor and said high pressure compressor." DA24, col. 4, lines 50-53 (emphasis added). The context of the claim language – "said gas generator including at least one externally mounted intercooler" – indicates to one of ordinary skill in the art that "externally mounted" is in relationship to the gas generator.

The specification confirms this understanding. The patent describes the intercooler as physically separate from the "integral modular" gas generator. DA10, col 4, lines 31-36 ("[I]t is an object of this invention to provide an intercooled gas generator … as an integral modular unit for easy installation and removal with respect to the intercooler(s) …."). The patent also explains

that "[t]he cooled air is returned to the gas generator 20[.]" DA16, col. 15, lines 1-2. Thus, the intercooler must be located outside of the gas generator in order for the cooled air to return to the gas generator.

None of the figures in the '499 patent depict any intercooler whatsoever – either internally or externally mounted – except schematically in Figure 1. *See* DA2 - DA8. The figures depicting the engine show ducts leading away from and back to the gas generator. For example, figures 2 and 3 are views of "the intercooled gas generator <u>of the present invention</u> illustrating the intercooling exit and re-entrance arrangement." DA11, col. 5, lines 40-45 (emphasis added). Figures 2 and 3 show ducts 36 and 42 leading from the gas generator 20 towards the intercoolers, but does not show the intercoolers 38 and 40. *See* DA2-DA3; DA12, col. 7, lines 33-36. Thus, one of ordinary skill in the art would understand that the intercoolers are outside of the gas generator, which contains both the low pressure compressor outer casing and the high pressure compressor outer casing. *See* DA12, col. 7, lines 24-32; DA16, col. 15, lines 34-52 (identifying the components of the "gas generator 20 of this invention," including the low pressure compressor and the high pressure compressor). The patent does not disclose an intercooler mounted inside the gas generator and the Court should not construe the claims so broadly as to encompass such a configuration. *On Demand Mach. Corp.*, 442 F.3d at 1340.

The prosecution history confirms that the government's proposed construction is correct. During the prosecution of the application that eventually led to the '499 patent, the examiner rejected application claim 69 as anticipated by the Hull and DuPont prior art references.[3] *See* DA55 [G000680]. The examiner explained: "Both references disclose concentric, multi-spool

---

[3]Application claim 69, after amendment, eventually issued as claim 1 of the '499 patent.

gas turbines with intercoolers between high and low pressure compressor stages[.]" *Id.*; *see also* DA56 [G000681] (The examiner reiterating that "[i]t is also known in the art that a concentric, twin-spool gas turbine configuration can be arranged to accommodate an intercooler as evidenced by Hull and Du Pont."). In response to the rejection, Mr. Rice amended claim 69 to add the "externally mounted" requirement to the intercooler limitation. *See* DA66 [G000702]; *see also* DA61-62 [G000697-98] (amended claims with the added language underlined). Mr. Rice asserted that the claim had "been amended to distinguish the gas generator portion of the claimed power producing system" over Hull and DuPont. DA66 [G000702].

Hull discloses an intercooler ("heat exchanger") 16 located inside the engine's casing 11, which houses the two compressors 17 and 18. *See* DA87 (figs. 3-6); DA89, col. 4, lines 15-16, 32-38. Representative figure 3 from Hull is shown below with the intercooler 16 located between compressors 17 and 18 highlighted.




DA87; *see also* DA89, col. 4, lines 33-37.

Similarly, DuPont discloses a gas turbine engine with intercoolers ("heat exchanger[s]") 26 and 28 mounted inside of the engine's "cylindrical housing 13" which is the casing containing intake fans 17 and 18 and the compressors 27 and 29. DA92, col. 1, line 68 - col. 2, line 21. The figure from DuPont is shown below, with the intercoolers highlighted.



DA91.

In the remarks accompanying the amendment, Mr. Rice criticized the Hull configuration and distinguished his claimed invention over the reference, stating:

> The Hull patent no. 3,273,340 covers an aircraft propulsion fan engine. Claims 69 and 72 have been amended to include at least one externally mounted counterflow intercooler. Considerable surface area is required to cool the partially compressed air to a temperature which closely approaches the temperature of the coolant at its inlet to the intercooler. Such an intercooler is heavy, large and bulky – not suitable for aircraft. Hull uses annular ducting and intercooler and not separate piping to an externally mounted intercooler. Low pressure drop is necessary and not possible for close approach temperatures in the Hull arrangements.

DA66-67 [G000702-03] (emphasis added). Thus, the applicant placed the public on notice that his invention requires "separate piping to an externally mounted intercooler" and that he has disclaimed the use of an annular intercooler. *See Computer Docking Station Corp.*, 519 F.3d at 1379. One of ordinary skill in the art would understand that the required separate piping also requires that the externally mounted intercooler be mounted separately from and outside of the gas generator casing. Mr. Rice further confirmed this understanding is correct, stating:

> The Applicant's invention with a separately mounted intercooler(s) and the radial ducting to and from the intercooler(s) with connection flanges makes it possible to disconnect the gas generator from the intercooler(s) and quickly

> remove the entire gas generator without disturbing the heavy intercooler(s) and bulky ducting. This arrangement provides a distinct advantage for offplant inspection and overhaul of the twin spool, high pressure ratio gas generator.

DA69-70 [G000705-06].

Mr. Rice also criticized DuPont's annular ducting and intercooler and distinguished his claimed invention over the DuPont reference.

> The DuPont et al patent no. 3,486,340 describes a jet engine which has compression intercooling by means of a cryogenic fuel coolant. The Applicant's invention incorporates an externally mounted intercooler. The intercooler of the Applicant's invention is heavy, large and bulky and not at all suitable for aircraft. A close approach temperature is achieved in the Applicant's invention by means of counter current flow of the intercooler. Annular ducting and intercooler are used by DuPont et al thus limiting the surface area and approach temperature achievable. DuPont et al therefore have the same limitations as Hull.

DA67-68 [G000703-04]; *see also* DA69 [G000705] ("The Hull and DuPont et al patents both use annular ducting. The annular heat exchanger offers limited heat exchange surface because of restraints on size and weight for aircraft."). Thus, the applicant again informed the reader that his invention does not use an annular intercooler.

Plaintiff concedes that the applicant disclaimed subject matter during the prosecution. Pl.'s Cl. Const. Br. at 12. However, plaintiff attempts to limit the disclaimed subject matter to "an intercooler mounted in the axial flow path of either compressor." *Id.* at 16. As quoted above, the applicant distinguished the prior art based on the use of annular ducting and annular intercoolers, and due to the lack of separate piping to an externally mounted intercooler. Also, Mr. Rice affirmatively stated that his invention utilizes "separately mounted intercooler(s)." DA69 [G000705]. Furthermore, plaintiff erroneously suggests that the airflow through Hull and DuPont is purely axial. *See* Pl.'s Cl. Const. Br. at 13-15; *id.* at 14 (asserting that the Hull ducting is "aligned along a single axis."). DuPont specifically states that air flows radially between

compressor 27 and intercooler 28. DA92, col. 2, lines 17-19 ("The secondary air leaving the compressor 27 is guided radially outward and into another fuel-to-air heat exchanger 28."); *see also* DA91 (The figure in DuPont showing the air from compressor 27 traveling radially to the intercooler 28 and then radially to compressor 29.). In distinguishing his invention, the applicant referenced this intercooler 28. DA68 [G000704]. Concerning the Hull reference, the Hull figure does schematically depict the intercooler 16 as partially in the axial flow path from the compressor 17. *See* DA87, Fig. 3. However, Hull also shows the air through the intercooler as flowing radially up and then back down between compressors 17 and 18. *Id.* The applicant did not, as plaintiff argues, limit his disclaimer to an intercooler mounted in the axial flow path.

Plaintiff contends that "externally mounted" means "mounted outside the casing of the low pressure compressor and the casing of the high pressure compressor." Pl.'s Cl. Const. Br. at 10. However, prior to amendment, the claim required "an intercooler positioned between" the two compressors. *See* DA61 [G000697]. Because "between" suggests that the intercooler is not inside either compressor, the claim required the intercooler to be mounted outside of the two compressors prior to amendment. Plaintiff's proposed construction would render meaningless the addition of the "externally mounted" requirement. Further, in the claim as issued, the phrase "externally mounted" would be redundant with the "positioned between" language. *See* Pl.'s Cl. Const. Br. at 11 (Plaintiff arguing: "That is, in the same way the intercooler is 'positioned between' the two compressors, the intercooler is also 'external' to those same compressors."). Plaintiff's proposed construction is inconsistent with the intrinsic evidence and should be rejected.

The Court should adopt the government's proposed construction, as it is consistent with the intrinsic evidence. The government's proposed construction is similar to that adopted by the

Magistrate in the Texas action. *See Rice v. Honeywell Int'l, Inc.*, 2006 WL 3420247, at *5 ("Accordingly, the Court construes the term 'externally mounted intercooler' to mean 'a heat exchanger located outside the casing containing the low and high pressure compressors.'").

**B. "said outlet duct being configured to radially expand said air flow to a low velocity"**

| The Government's Proposed Construction |
| --- |
| That portion of the air conduit which directs the air out of the gas generator and which is shaped so as to increase the cross-sectional flow area in a direction generally perpendicular to the axis of the gas generator resulting in a velocity of less than approximately 200 feet per second. |

This limitation concerns the configuration of the duct which exits the air from the low pressure compressor and directs it towards the intercooler. *See* DA24, col. 4, lines 53-55. The parties' primary dispute concerns the meaning of the term "low velocity" in the context of this limitation. The government's position, that the term refers to a specific magnitude of velocity, is supported by the intrinsic evidence, while plaintiff argues that the term "low velocity" means "a decreased velocity," Pl.'s Cl. Const. Br. at 16.

The claimed "outlet duct" is the portion of the air conduit that directs the air out of the gas generator and which is "an integral part of the integral gas generator." DA49 [G000628]; *cf.* DA12, col. 7, lines 3-15; col. 8, lines 3-13; DA3, Fig. 3. The claim language requires a duct configuration that results in a "low velocity." The person of ordinary skill in the art understands that a low velocity is desirable. *See* DA67 [G000703]. That person, recognizing this, would look to the specification to ascertain the specific meaning of "low velocity" for purposes of the claimed invention. *Phillips*, 415 F.3d at 1313.

The specification describes the outlet duct configuration as a novel aspect of the invention. *See* DA12, col. 7, lines 3-15 (explaining that "the particular physical modular arrangement and method of getting the partially compressed air out of and back into said coaxial shafted-modular gas-generator compressor 24 and 44 at specific low-pressure range … are intended to be described as new."); DA16, col. 15, lines 53-61 (asserting that "the addition and arrangement of (a) the exit elbow 100, diffuser 102 or 230 and duct connection 36 … are new"). The specification also reveals that the claimed invention requires the claimed duct to result in a low velocity of a specific magnitude, not simply a relatively lower velocity. *See* DA12, col. 8, lines 10-11 ("The gas velocity exiting diffuser 102 is at about Mach 0.14 corresponding to about 200 ft/sec according to the base temperature involved."); DA16, col. 15, lines 19-22 ("The straight-wall vaneless diffuser of FIGS. 3 and 6b will only provide an effective area ratio change of about 2 without flow separation and the exit velocity will be about 200 ft/sec[.]"). Additionally, the person of ordinary skill in the art would understand that dependent claim 9 defines the "said low velocity" of claim 1 as "less than approximately 200 feet per second."[4] DA25, col. 6, lines 1-4.

The prosecution history supports the government's proposed construction. This limitation was added in response to the examiner's rejection of the asserted claim as anticipated by the Hull and DuPont references. DA66 [G000702]. The applicant distinguished his invention on the resulting magnitude of the air velocity, not the decrease in velocity within the duct. *See* DA67-68 [G000703-04]. The applicant criticized Hull, asserting that Hull's configuration would

[4]The doctrine of claim differentiation, which creates a presumption that each claim has a different scope, is inapplicable because claim 9 contains the additional requirement of a radial diffuser. *See Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1139-40 (Fed. Cir. 2007).

result in a velocity leaving the compressor and entering the intercooler that is too high for the applicant's invention. DA67 [G000703]. The applicant remarked:

> Further, it is commonly known by those knowledgeable in gas turbine design that the exit velocity of an axial flow compressor is typically mach 0.3 which is far too high for a low pressure drop heat exchanger. Pressure drop varies as the square of the velocity, and the Hull heat exchanger and ducting pressure losses would be very high and several times the total 3% given as typical for the Applicant's invention.
>
> The Applicant recognized the above problem areas in his invention and creatively solved the problems with the unique and novel outlet and return ducting to a counterflow externally mounted intercooler.

DA67 [G000703]. Thus, the applicant indicated that there is a maximum acceptable velocity in his invention and that the purportedly "unique and novel outlet … ducting" results in an acceptable velocity.

The applicant also criticized DuPont's configuration and the purportedly resulting high velocity. The applicant asserted that a velocity of "mach 0.3 [is] much too high" and that "[a] low velocity of mach less than 0.10 is needed[.]" DA68 [G000704]. In distinguishing DuPont, he stated:

> The DuPont et al patent single figure clearly shows the axial flow fan 18 discharge air being fed directly to heat exchanger 26. The air velocity would be too high for a low air side pressure drop heat exchanger - especially with the double pass heat exchanger arrangement used. The fan exit velocity would be about mach 0.3 and much too high. <u>A low velocity of mach less than 0.10 is needed</u> and knowing that pressure drop varies as the square of the velocity, the DuPont et al heat exchanger 26 or 28 pressure drop would be several times greater than the projected total 3% of the Applicant's invention.

DA68 [G000704] (emphasis added). According to the specification, Mach 0.1 corresponds to a velocity of less than about 200 feet per second. DA12, col. 8, lines 10-12 ("The gas velocity exiting diffuser 102 is at about Mach 0.14 corresponding to about 200 ft/sec according to the base temperature involved."). Therefore, the applicant advised the person of ordinary skill in the

art that the invention requires a "low velocity" of less than about 200 ft/sec. *See Computer Docking Station Corp.*, 519 F.3d at 1379. The applicant's statements in the prosecution history constitute a waiver of ducts configured for a resulting velocity greater than Mach 0.10.[5] *See id.* at 1374-76, 1379.

The term "radial" in this claim phrase refers to a direction generally perpendicular to the axis of the gas generator. The figures in the patent show the air flowing out of the gas generator in a direction that is substantially at a right angle to the longitudinal axis of the engine. *See* DA2-DA6. This does not mean that the flow must be perfectly perpendicular, just generally so. *See* DA15, col. 14, lines 38-50 (the flow may be curved backwards or slightly forward to accommodate other structures); DA6, Fig. 7. This flow direction is distinguished from flow in the axial direction. *See* DA12, col. 8, lines 6-7 ("the airflow direction is changed from that of axial to radial."); *cf.* DA10, col. 3, lines 3-8 (referring to the "axially aligned gas generator and power turbine in which gas flow through the gas generator, reheat combustor and power turbine is substantially linear throughout").

The specification shows that the increase in the duct's cross-sectional area results in the desired velocity. The patent associates the change in velocity with the increase of the duct area. *See* DA15, col. 14, lines 6-8 ("The ratio of the rectangular cross-sectional area at the radial entrance 240 to that of the exit 242 can be typically about 4 to effect a velocity change of 4."); DA16, col. 15, lines 19-23 ("The straight-wall vaneless diffuser of FIGS. 3 and 6b will only

---

[5]In the Texas action, the Magistrate adopted Mr. Rice's proposed construction of "low velocity," in part, because the Magistrate did not perceive that the applicant distinguished prior art on the basis of the specific velocity. *Rice v. Honeywell Int'l, Inc.*, 2006 WL 3420247, at *7-8. As discussed above, the applicant did distinguish the prior art by criticizing the velocities employed and by stating the "needed" velocity.

provide an effective area ratio change of about 2 without flow separation and the exit velocity will be about 200 ft/sec[.]"). Also, figure 7a clearly shows an increase in cross-sectional area of the outlet duct. *See* DA6. Plaintiff argues that "it is the 'air flow' that is expanding, not the cross-sectional area of the conduit." Pl.'s Cl. Const. Br. at 17. Plaintiff does not identify the importance of any such distinction and does not explain how the air can expand without a corresponding expansion of the duct area.

The government is not, as plaintiff suggests, limiting claims to a specific "preferred" embodiment in the specification.[6] *See* Pl.'s Cl. Const. Br. at 18. Claims are properly construed by reference to the specification and the prosecution history. *See Phillips*, 415 F.3d at 1316-17; *cf. Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136-38 (Fed. Cir. 2007) (rejecting the argument that the defined numeric value in the specification was merely an example, and construing the claim as limited to that value). "[T]he claims cannot be of broader scope than the invention that is set forth in the specification." *On Demand Mach. Corp.*, 442 F.3d at 1340. The specification indicates that a velocity of "about 200 ft/sec" may be utilized in the invention, *see* DA12, col. 8, lines 10-12, but discloses that a lower velocity of 50 to 75 ft/sec is desirable, DA15, col. 14, lines 58-63. The specification does not disclose the use of higher velocities. Under plaintiff's construction, the claims cover any velocity, no matter how high, as long as the velocity is reduced in the outlet duct. *See* Pl.'s Cl. Const. Br. at 18. The

---

[6]Plaintiff's cites *Toro Co. v Deere & Co.*, 355 F.3d 1313, 1319-20 (Fed. Cir. 2004), for the proposition that "it is error to limit the claims to those specific parameters" in a "preferred embodiment disclosed in the specification." Pl.'s Cl. Const. Br. at 18. Toro did not hold that it is always error to limit the claims to the embodiments disclosed in the specification. *See Toro Co.*, 355 F.3d at 1319-20. As discussed above, the intrinsic evidence demonstrates that the invention is limited to a specific velocity, and that velocity is "less than approximately 200 feet per second."

specification's description of the invention is not so broad, and the Court should reject plaintiff's proposed construction. Also, plaintiff's proposed construction is contrary to the inventor's express statement during prosecution that "[a] low velocity of mach less than 0.10 is needed," DA68 [G000704], and the dependent claim's definition of "said low velocity of less than approximately 200 feet per second." DA25, col. 6, lines 1-4.

Plaintiff is asking the Court to rewrite the claim. Plaintiff requests the Court to replace the claimed "low" velocity with a "decreased" (i.e., low<u>er</u>) velocity. *See* Pl's Cl. Const. Br. at 16. The Court cannot reword the claim as plaintiff desires. *See Autogiro Co. of Am. v. United States*, 384 F.2d 391, 396 (Ct. Cl. 1967) ("No matter how great the temptations of fairness or policy making, courts do not rework claims. They only interpret them."); *see also Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("Thus, in accord with our settled practice we construe the claim as written, not as the patentees wish they had written it.").

Additionally, plaintiff's proposed construction renders the term "low velocity" superfluous. Plaintiff concedes that "[a]fter expansion, the air flow velocity is necessarily and inherently lower than the high velocity of the air flow before expansion." Pl.'s Cl. Const. Br. at 17. Thus, under plaintiff's construction, the phrase "to a low velocity" is redundant with the phrase "to radially expand said air flow" because the expansion of the air flow would always result in a "decreased" velocity. Claims should not be construed so as to render terms meaningless. *See Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("While not an absolute rule, all claim terms are presumed to have meaning in a claim.").

Plaintiff, citing *Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1332-33 (Fed. Cir. 2007), asserts that the specification does not indicate "that a low velocity of less than 200

feet per second is an 'essential' feature of the claimed invention." Pl.'s Cl. Const. Br. at 18. Even if this assertion were true, the statements made by the applicant during the prosecution clearly and unmistakably indicate to the public that there is a maximum velocity that may not be exceeded in the invention, and that a "low velocity of mach less than 0.10 [which is less than 200 feet per second] is needed." DA68 [G000704].

The court should adopt the government's proposed construction because it is consistent with the intrinsic evidence, particularly the statements made by the inventor during the prosecution.

### C. "said return duct being configured for low radial flow return velocity to said high pressure compressor"

| The Government's Proposed Construction |
| --- |
| That portion of the air conduit which directs the air from the intercooler to the high pressure compressor in a direction generally perpendicular to the axis of the gas generator into the gas generator and which maintains the air flow at a velocity of less than approximately 200 feet per second. |

As with the preceding "outlet duct" limitation, this "return duct" limitation was added in response to the examiner's rejection of the asserted claim in light of prior art references. *See* DA66 [G000702]. The term "low velocity" has the same meaning as in the "outlet duct" limitation – less than approximately 200 feet per second. *Cf. Fin Control Systems Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001) ("First, we begin with the presumption that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims.").

During the prosecution, the applicant asserted that his invention solves the problems associated with high velocity air flow through the intercooler with his "unique and novel outlet

and return ducting." DA67 [G000703]. He also indicated, in prosecuting an earlier application to which the '499 patent claims priority, that a low velocity of the air returning from the intercooler is "critical." *See* DA39 [G000123] ("It is well established that pressure drop and frictional losses vary as the square of the velocity. Therefore, velocity is critical, particularly where the air turns into the compressor blading."). The applicant stressed that "[a] low velocity of mach less than 0.10 is needed" for the air flowing to the intercooler of his invention. DA68 [G000704]. This air flows back from the intercooler to the high pressure compressor via the return ducting. Thus, it is appropriate that the term "low velocity" in the return duct limitation also means a velocity of no more than Mach 0.10 (which is less than 200 feet per second, *see* DA12, col. 8, lines 10-11).

This construction is consistent with the specification, which indicates that the "desired velocity" is even lower. DA15, col. 14, lines 58-63 ("the exit velocity at flange 268 is now about 50 to 75 ft/sec, or the desired velocity for low pressure loss flow for the piping and ducting 36 to the intercoolers 38 and 40 and the return ducting to the high-pressure compressor 44."); *see also* DA12, col. 8, lines 25-28 ("Generous cross-sectional area of the inlet duct 104 is provided to keep the inlet air velocity low at a value of approximately 50 to 75 ft/sec to reduce inlet pressure loss."); DA25, col. 6, lines 9-12 (dependent claim 11, with a return velocity of "less than approximately 75 feet per second.").

As with the preceding phrase, the term "radial" here also refers to a direction generally perpendicular to the axis of the gas generator. *See* DA2-DA6 (patent figures showing overall flow in the return duct in a direction substantially at a right angle to the engine's axis).

Plaintiff contends that the term should be construed such that the duct is "shaped and positioned to result in a" relatively "lower velocity." *See* Pl.'s Cl. Const. Br. at 19. The Court

should reject plaintiff's implicit request to rewrite the claim. *See Autogiro Co. of Am.*, 384 F.2d at 396; *Chef America, Inc.*, 358 F.3d at 1374. The claim phrase requires that the duct be configured for a "low velocity," not a "lower" velocity as plaintiff proposes.

Plaintiff's proposed construction should also be rejected because it is inconsistent with the specification. Plaintiff proposes that the claimed return duct is configured "to result in a velocity … that is lower." Pl.'s Cl. Const. Br. at 20. However, the specification indicates that the duct is configured to maintain a specific velocity, not simply result in a lower velocity. DA12, col. 8, lines 25-28 ("Generous cross-sectional area of the inlet duct 104 is provided to keep the inlet air velocity low at a value of approximately 50 to 75 ft/sec to reduce inlet pressure loss.") (emphasis added); *see also* DA25, col. 6, lines 9-12 (dependent claim 11 "wherein said return duct has a selected cross-sectional area to maintain said airflow at a velocity of less than approximately 75 feet per second.") (emphasis added).

The government's proposed construction is consistent with the intrinsic evidence and should be adopted.

**D. "connections "**

| The Government's Proposed Construction |
|---|
| Piping and the associated flanges which deliver air from the compressor outlet duct to the externally mounted intercooler and from the externally mounted intercooler to the compressor return duct. |

The disputed term "connections" appears in the claim in the context of the air conduits between the compressors and the intercooler. DA24, col. 4, lines 56-61 ("wherein said compressor outlet and return ducts and connections between said compressors and said intercooler are provided between said axially positioned low and high pressure compressors for air flow to and from said intercooler in counterflow with coolant[.]" (emphasis added)). The

phrase "said compressor outlet and return ducts" refers to the low-velocity-configured ducts discussed above. The parties' proposed constructions are similar in that they both require some structure between the intercooler and the outlet and return ducts. The government's proposed construction requires this structure to include piping and the associated flanges, consistent with the intrinsic evidence. Plaintiff's construction, however, requires only flanges.

The specification supports the conclusion that "connections" refer to piping and associated flanges. The specification identifies items 36 and 42 as "duct connection[s]." DA16, col. 15, lines 56-57. The patent describes the "unique arrangement" of, *inter alia*, the duct connections 36 and 42 as the novel aspect of the invention. *See* DA16, col. 15, lines 53-63. Figure 3 of the patent indicates that these duct connections are piping, not just flanges. *See* DA3. The description of Figure 8 similarly indicates that item 36 is piping, not merely flanges. DA15, col. 14, lines 67-68 ("Flanges 276 are connected to line 36 which ducts the air to intercoolers 38 and 40."). The specification also identifies item 272 as "outlet connections" and that the item 276 is a flange. DA15, col. 14, lines 60-65. Figure 8 shows that the "outlet connections" 272 are piping guiding the air towards the intercooler, and the flange 276 forms the end of this piping. *See* DA6.

The prosecution history confirms the government's proposed construction. During the prosecution, the patent examiner rejected the pertinent claim as anticipated by the Hull and DuPont prior art references, which disclose intercooled gas turbine engines. *See* DA55 [G000680]. The applicant responded by amending the claim so as to require an externally mounted intercooler. DA66 [G000702]. The applicant criticized Hull's ducting and intercooling arrangement, asserting that Hull lacked the external intercooler and corresponding separate piping.

> The Hull patent no. 3,273,340 covers an aircraft propulsion fan engine. Claims 69 and 72 have been amended to include at least one externally mounted counterflow intercooler. Considerable surface area is required to cool the partially compressed air to a temperature which closely approaches the temperature of the coolant at its inlet to the intercooler. Such an intercooler is heavy, large and bulky - not suitable for aircraft. <u>Hull uses annular ducting and intercooler and not separate piping to an externally mounted intercooler.</u> Low pressure drop is necessary and not possible for close approach temperatures in the Hull arrangements.

DA66-67 [G000702-03] (emphasis added). The applicant distinguished the DuPont patent for the similar reasons. DA68 [G000704] ("Annular ducting and intercooler are used by DuPont et al thus limiting the surface area and approach temperature achievable. DuPont et al therefore have the same limitations as Hull."). Thus, Mr. Rice clearly distinguished his invention from the prior art gas turbine engines lacking "separate piping" between the on-engine ducts and the externally mounted intercooler. One of ordinary skill in the art would understand that the separate piping is instrumental in properly managing the air flow to the inventor's "heavy, large and bulky" intercooler. The term "connections" in the claim refers to this separate piping.

During the prosecution, the applicant also touted the ease of disassembly as an advantage of his arrangement:

> The Applicant's invention with a separately mounted intercooler(s) and the radial ducting to and from the intercooler(s) with connection flanges makes it possible to disconnect the gas generator from the intercooler(s) and quickly remove the entire gas generator without disturbing the heavy intercooler(s) and bulky ducting. This arrangement provides a distinct advantage for offplant inspection and overhaul of the twin spool, high pressure ratio gas generator.

DA69-70 [G000705-06]. This passage indicates that flanges between the radial ducting in the gas generator and the bulky ducting (the piping) to the intercooler allow the gas generator to be removed independently of the intercooler and the bulky ducting. This is consistent with the government's proposed construction that the claimed "connections" are the piping, along with

the associated flanges, which deliver air from the compressor outlet duct to the externally mounted intercooler and from the externally mounted intercooler to the compressor return duct.

Plaintiff misleadingly suggests that the term "connections" only appears in the specification twice, and that both times in the context of "flange connections." Pl.'s Cl. Const. Br. at 22 ("The specification refers twice to 'connections.' In each case the connections are specifically 'flange connections.'"). Plaintiff's reliance on these two references is misplaced. The parties agree that the disputed term "connections" pertains to the flow of air, but plaintiff's two cited examples concern, respectively, cooling steam piping and a turbine shaft coupling, not air flow. *See* Pl.'s Cl. Const. Br. at 22. Although the specification does contain other references to connections,[7] the government's proposed construction is consistent with the intrinsic evidence taken as a whole, particularly the applicant's indication that his invention requires separate piping to the externally mounted intercooler.

[7] *E.g.* DA15, col. 14, lines 55-66 (Referring to a "round flange connection 68" which attaches the "toroidal-shaped duct 270" (i.e. separate piping) to the on-engine outlet ducting.)

**E. "high pressure compressor having an inlet flow area directly proportional to the outlet flow area of the low pressure compressor, and inversely proportional to the absolute temperature ratio between the high temperature air flow discharged from the low pressure compressor compared to the low temperature air flow from the intercooler passing to the inlet area of the high pressure compressor"**

| The Government's Proposed Construction |
| --- |
| This phrase is a design rule applied to optimize the cross-sectional area of the air flow inlet of the high pressure compressor (HPC) in relation to the cross-sectional area of the air flow outlet of the low pressure compressor (LPC) for a single, particular predetermined operating condition (the design point) of the intercooler (1) by having the areas increase or decrease together on a constant ratio basis between them and (2) by having the cross-sectional area of the air flow inlet of the high pressure compressor also increase or decrease inversely to the ratio of the absolute temperature of the air flow at the cross-sectional area of the air flow outlet of the low pressure compressor divided by the absolute temperature of the air flow at the cross-sectional area of the air flow inlet of the high pressure compressor (i.e., the area increases as the ratio gets smaller and decreases as the ratio gets larger) such that the expression $T_{LPC}/T_{HPC} = A_{LPC}/A_{HPC}$ is satisfied. The claim does not cover an apparatus in which the low pressure compressor and high pressure compressor matching relationship is achieved by way of changing a compressor speed or by changing the velocity of the air flow through the compressors. |

After the'499 patent initially issued, Mr. Rice returned to the United States Patent and Trademark Office and requested that the patent be reexamined in light of certain prior art references. Mr. Rice added this entire disputed phrase to the asserted claim during the reexamination in an attempt to distinguish his claimed invention from the prior art. DA72, 80 [G000843, G000851].

This phrase pertains to the relationships between the flow areas and air temperatures at the outlet of the low pressure compressor (LPC) and the inlet of the high pressure compressor (HPC). The claim language requires that two conditions be met: 1) the inlet flow area of the high pressure compressor ($A_{HPC}$) must be directly proportional to the outlet flow area of the low pressure compressor ($A_{LPC}$); and 2) the inlet flow area of the high pressure compressor must be

inversely proportional to the absolute temperature ratio between the high temperature air flow discharged from the low pressure compressor ($T_{LPC}$) compared to the low temperature air flow from the intercooler passing to the high pressure compressor ($T_{HPC}$). DA24, col. 4, line 65 - DA25, col. 5, line 3. Thus, the areas increase or decrease together on a constant ratio basis, and the area of the high pressure compressor inlet also increases or decreases inversely to the ratio of the absolute air temperatures at the outlet of the low pressure compressor and at the inlet of the high pressure compressor. These two requirements may be expressed mathematically as $A_{HPC} \propto A_{LPC}$ and $A_{HPC} \propto 1/(T_{LPC}/T_{HPC})$, respectively. The parties agree that these conditions are met when the expression $T_{LPC}/T_{HPC} = A_{LPC}/A_{HPC}$ is satisfied. *See* Pl.'s Cl. Const. Br. at 25-26. However, the parties disagree as to when that expression must be met. The government correctly contends that the relationship must be satisfied at a single, particular predetermined operating condition (the design point).[8] Plaintiff's position is unclear. Plaintiff's proposed construction implies that this relationship may be satisfied at any time "while the system is producing power," *see* Pl.'s Cl. Const. Br. at 24, but plaintiff also appears to assert that the limitation is satisfied if the engine is "capable" of satisfying the relationship regardless of the actual operating conditions, *see id.* at 26-27. Both of plaintiff's arguments are incorrect for the reasons set forth below.

The '499 patent describes adapting or modifying a non-intercooled gas generator for intercooling. *See, e.g.*, DA9, col. 1, line 61 - col. 2, line 1 ("An integral single-bodied gas generator with a coaxial shafting arrangement for driving the low pressure and high-pressure compressor sections with intercooling connections is made possible whereby gas generators such

---

[8]The Texas District Court adopted a "design rule" claim construction similar to the government's proposed construction. *See Rice v. Honeywell Int'l, Inc.*, 2006 WL 3420247, at *11 (Magistrate's claim construction); *Rice v. Honeywell Int'l, Inc.*, 494 F. Supp. 2d at 493-97, 501-05 (applying the construction in finding non-infringement).

as the GE LM5000, RR RB211, P&WA JT9 and subsequent third-generation gas generators expected to be developed from the NASA $E^3$ (Energy Efficient Engine) aircraft gas turbine program can be applied through proper modifications."); DA9, col. 2, lines 53-58 ("Industrializing the $E^3$ engine gas generators, considered to be the third generation of aircraft engines, is inevitable based on past history, and adapting them for intercooling can be accomplished using the basic engine designs coming from the $E^3$ program and applying the process principles and design features of this invention."). The disputed phrase is one of the design features of the invention.

The patent states that the intercooling increases the density of the air flowing from the low pressure compressor to the high pressure compressor "according to Boyles Law." *See* DA13, col. 9, lines 6-10. There are several ways for a turbine designer to accommodate the effects of intercooling. *See* DA84 [G000855]. For example, one could adjust the respective speeds of the low pressure and high pressure compressors or one could control the velocity of the air flow through the engine with the use of variable stator blades. *Id.* During the reexamination, Mr. Rice limited his claimed invention to a gas turbine engine in which the temperature and flow area conditions at the high pressure compressor inlet are matched to those at the exit of the low pressure compressor. *See* DA83 [G000854]; *see also* Pl.'s Cl. Const. Br. at 30 (Plaintiff agreeing that "the subject limitation is necessarily a 'matching relationship[.]").

The applicant distinguished certain prior art references, arguing that they do not suggest the claimed proportionality relationships. DA83 [G000854]. The applicant also touted the purported benefits of satisfying the claimed matching relationship according to his invention.

> The specification at Col. 8 commencing at line 29, and particularly Col. 9, line 1 through Col. 10 line 55, describe the significant benefits which will be obtained by the power producing system of the present invention when the inlet flow area

> to the high pressure compressor is matched to the conditions of the air flow exiting the low pressure compressor. As explained in the specification, this matching relationship according to the present invention is governed by Boyles Law, and satisfying this relationship significantly increases the efficiency of the power producing system.

DA83 [G000854].

The portion of the specification referenced by the applicant describes obtaining this matching relationship by modifying the flow area of the low pressure compressor. The low pressure compressor radius is increased to accommodate the increased density of the air attributable to the intercooling. *See* DA13, col. 9, lines 1-62. The patent compares the "pitch-line radius" of the "normal" (i.e., non-intercooled) low pressure compressor with the larger radius of the modified engine. *See* DA13, col. 9, lines 16-45; *see also* DA 12, col. 8, lines 28-55; Fig. 4. The parties agree that the person of ordinary skill in the art would recognize that Mr. Rice used the term "pitch-line radius" as a proxy for the compressor flow area.[9] *See* Pl.'s Cl. Const. Br. at 28 n.13. Thus, the "pitch-line radius" comparison is also a comparison of the flow areas. The specification explains that the "pitch-line radius" of the low pressure compressor is increased as a function of the temperature decrease due to intercooling and in proportion to the size of the high pressure compressor. *See* DA13, col. 9, lines 16-62. Thus, the patent describes the design of a turbine to satisfy the claimed matching relationship. One of ordinary skill in the art would recognize that the added limitation is a design rule applied to optimize the size of the compressor flow areas relative to the temperatures before and after the intercooler.[10] *Cf.* Pl.'s Cl.

---

[9]The government, however, does not agree with plaintiff's unsupported definition of "pitch-line radius." *See* Pl.'s Cl. Const. Br. at 13. Plaintiff does not point to any evidence that that term has a recognized meaning in the context of flow areas.

[10]Plaintiff mischaracterizes the government's position by stating that the government is
(continued...)

Const. Br. at 29 (Plaintiff agreeing that the purpose of the matching relationship is to "optimize the advantage gained by intercooling.").

The specification indicates that the claimed relationship must be satisfied at a single, predetermined operating condition (the design point). The specification describes the design of the engine modified for intercooling "according to Boyle's Law" and contains examples at specific operating temperatures and pressures. *See* DA13, col. 9, lines 1-45. The specification also states that "[t]he intercooler is sized to effect an exit temperature of 100° F. when considering a standard 59° F. day." DA16, col. 16, lines 54-55. Therefore, one of ordinary skill in the art would understand that the claimed engine is designed to satisfy the matching relationship at a predetermined set of operating conditions. The intrinsic evidence does not support plaintiff's proposed construction in which the relationship may be satisfied at any time "while the system is producing power." *See* Pl.'s Cl. Const. Br. at 23.

The claim does not cover an apparatus in which the low pressure compressor and high pressure compressor matching relationship is achieved by way of changing a compressor speed or by changing the velocity of the air flow through the compressors. During the reexamination, the applicant distinguished the particular matching relationship of his invention from "various other factors [that] could theoretically be changed to satisfy Boyle's Law," including changing compressor speed and changing air flow velocity. DA84 [G000855]. He stated:

> For example, the speed of both the high and low pressure compressors could be modified, although according to the present invention, a change in the speed is not

---

[10](...continued)
"defining [the flow areas of the compressors] as a reference to the act of modifying the relative sizes of compressor flow areas[.]" Pl.'s Cl. Const. Br. at 24 n.9. The government contends that the claim covers an apparatus that satisfies the design rule, not that the claim covers the "act" of designing the engine.

> used to obtain the desired substantial matching to satisfy Boyles Law. Also, the velocity of the air flow could be changed, for example by utilizing variable stater [sic, stator] blades, to satisfy Boyles Law, although according to the teaching of the present invention such a velocity change is not utilized to achieve the substantial matching of the air flow between the low and high pressure compressors.

DA84 [G000855]. He further asserted that, in his invention, "[s]uch substantial matching of the low and high pressure compressors is uniquely obtained by satisfying the area and temperature relationships recited in the amended claims." *Id.* A person of ordinary skill in the art would recognize that the applicant disclaimed coverage of an apparatus in which either a compressor speed change or an air flow velocity change is used to match the air flow conditions. *See Computer Docking Station Corp.*, 519 F.3d at 1379 ("Here the sum of the patentees' statements during prosecution would lead a competitor to believe that the patentee had disavowed coverage of laptops.").

Plaintiff asserts that "[t]he scope of an apparatus claim includes the reasonable capabilities of the accused device." Pl.'s Cl. Const. Br. at 9 (citing *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1370 [sic, 1340], 1350 (Fed. Cir. 2007)). Plaintiff's reliance on *z4 Technologies* is misplaced as *z4 Technologies* discussed the capabilities of the accused in the context of an infringement analysis, not claim construction. *See id.* at 1350. *z4 Technologies* does not hold that claims should be construed to cover the capabilities of an accused. That case merely stands for the proposition that the capability for a non-infringing mode does not avoid infringement where the evidence shows that the claimed mode was in fact used. *Id.* at 1350 ("[I]nfringement is not avoided merely because a non-infringing mode of operation is possible."). Further, the Court must reject plaintiff's implied argument that claim scope is defined by the capabilities of the accused engine because "claims may not be construed with reference to the accused device."

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330-31 (Fed. Cir. 2006) (citations and internal quotes omitted); *id.* at 1326 -1327 (Although the accused device may provide context for the claim construction, "a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process[.]").

Plaintiff bases his proposed "capabilities" construction on a newly asserted meaning of the temperature terms. *See* Pl.'s Cl. Const. Br. at 26-27. The specification does not suggest that the matching relationship may be evaluated using the temperature of the air that the "low pressure compressor is capable of discharging" and the temperature of the air "that the intercooler is capable of providing." *See id.* at 27. Rather, the specification describes the matching occurring at the specific temperatures and flow areas of the engine. *See* DA13, col. 9, lines 17-45; *see also* DA83 [G000854] (The applicant referring to "the significant benefits which will be obtained by the power producing system of the present invention when the inlet flow area to the high pressure compressor is matched to the conditions of the air flow exiting the low pressure compressor.).

Plaintiff is reasserting a claim interpretation rejected by the Texas District Court. *See Rice v. Honeywell Int'l, Inc.*, 494 F. Supp. 2d at 494-96, 503. In the Texas action, plaintiff apparently argued that the WR-21 intercooler could withstand a certain maximum temperature due to the properties of the metals used in the intercooler, and the intercooler could conceivably cool the air to a minimum temperature coinciding with the freezing point of the liquid coolant in the intercooler. *See id.* at 503. However, plaintiff did not show that those temperatures would exist at the same time. *See id.* at 496. The District Court, rejecting plaintiff's argument, stated that "the claim construction taken in the context of the Memorandum Opinion and Order on

claim construction is only reasonably interpreted to mean a single, particular operating condition." *Id.* at 495. This Court should also reject plaintiff's attempt to expand the scope of the claim to cover an engine that is merely theoretically capable of satisfying the claimed relationship.

The Court should adopt the government's proposed construction, which is soundly based on the intrinsic evidence and where the parties agree that the limitation requires the specific matching relationship defined by the expression $T_{LPC}/T_{HPC} = A_{LPC}/A_{HPC}$.

## V. CONCLUSION

For the reasons set forth above, the Court should construe the disputed claim terms and phrases as proposed by the government.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JOHN FARGO
Director

June 9, 2008

s/ Ken B. Barrett
KEN B. BARRETT
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530
Phone: (202) 307-0343
Facsimile: (202) 307-0345

Attorneys for the United States