**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **IVAN G. RICE,** | § | |
| | § | |
| **Plaintiff,** | § | **No. 05-187C** |
| | § | |
| **vs.** | § | |
| | § | **Senior Judge James F. Merow** |
| **THE UNITED STATES** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

**PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I. INTRODUCTION ........ 1
II. ARGUMENT ........ 2
A. Externally Mounted Intercooler ........ 2
B. Outlet Duct Configured to Radially Expand Air Flow to a Low Velocity ........ 6
C. Return Duct Configured for Low Radial Flow Return Velocity ........ 10
D. Connections ........ 12
E. The Areas Limitation ........ 14
III. CONCLUSION AND PRAYER FOR RELIEF ........ 21

# TABLE OF AUTHORITIES

## CASES

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) ........ 19

*Autogiro Co. of America v. United States*,
384 F.2d 391 (Ct. Cl. 1967) ........ 2

*Cyrix Corp. v. Intel Corp.*,
846 F. Supp. 522 (E.D. Tex. 1994) ........ 15, 16

*Elbex Video, Ltd. v. Sensormatics Electrics Corp*,
508 F.3d 1366 (Fed. Cir. 2007) ........ 1, 20

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
909 F.2d 1464 (Fed. Cir. 1990) ........ 15

*Innova/Pure Water, Inc. v. Safari Water Filtration System, Inc.*,
381 F.3d 1111 (Fed. Cir. 2004) ........ 10

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ........ 1

*Lucent Technologies, Inc. v. Gateway, Inc.*,
525 F.3d 1200 (Fed. Cir. 2008) ........ 1, 3, 8

*O2 Micro International Ltd. v. Beyond Innovation Technology Co., Ltd.*,
521 F.3d 1351 (Fed. Cir. 2008) ........ 16

*Rice v. Honeywell International Inc.*,
No. 6:05-CV-330, 2006 WL. 3420247 (E.D. Tex. Nov. 21, 2006) ........ 6

*Saunders Group, Inc. v. Comfortrac, Inc.*,
492 F.3d 1326 (Fed. Cir. 2007) ........ 1, 7

*Technologies, Inc. v. Microsoft Corp.*,
507 F.3d 1370 (Fed. Cir. 2007) ........ 16

*Two-Way Media LLC v. America Online, Inc.*,
508 F. Supp. 2d 526 (S.D. Tex. 2007) ........ 16

**TABLE OF EXHIBITS**

L. Transcript of Proceedings Held on April 3, 2007 before Magistrate Judge John D. Love, pp. 35-39 (CA 6:05-CV-330, E.D. Tex. [Docket Entry dated April 14, 2007])

M. Robert C. Faber, Landis on Mechanics of Patent Drafting § 3:21, 3-48 to 3-50 (5th ed. 2003)

**TABLE OF APPENDICES**

1. (Amended) Complete Prosecution History of U.S. Patent Application Serial No. 06/572,548

# I. INTRODUCTION

Plaintiff's proposed constructions are based primarily on the plain and ordinary meaning of the words themselves, in the context in which they appear in the claim. Plaintiff's constructions are further guided by the how the claim terms are used in the specification and the prosecution history. In contrast, Defendant's proposed constructions avoid the plain and ordinary meaning of the actual words of the claim; they add extraneous limitations that narrow the scope of the claim without adding clarity. Defendant's proposed constructions incorporate statements from the specification that represent specific embodiments, and include statements from the prosecution history taken out of context.[1]

According to the Federal Circuit, "[c]laim terms are entitled to a 'heavy presumption' that they carry their ordinary and customary meanings." *E.g.*, *Elbex Video, Ltd. v. Sensormatics Elecs. Corp*, 508 F.3d 1366, 1370 (Fed. Cir. 2007) (citations omitted). In fact, "the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (citations omitted). Therefore, unless the specification identifies an "essential" feature, *Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007), or there is a "clear and unmistakable" disclaimer in the prosecution history, *Lucent Technologies, Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1211 (Fed. Cir. 2008), the heavy presumption of ordinary and customary meaning controls. In other words, the specification and prosecution history are to be used to understand the plain and ordinary meaning, but generally not to narrow claim scope.

---

[1] Plaintiff attaches hereto Amended Appendix 1 (the Prosecution History of U.S. Patent Application Ser. No. 06/572,548) to correct an inadvertent omission from the original Appendix 1.

In this case, Defendant has attempted to use the specification and file history to narrow the claim scope, in an effort to avoid a finding of infringement. The narrow limitations proposed by Defendant should be rejected as contrary to the intrinsic record of the patent and the Federal Circuit's guidelines for claim construction.

## II. ARGUMENT

### A. Externally Mounted Intercooler

The parties dispute where the intercooler is mounted, *i.e.*, the intercooler is mounted external to what? Plaintiff's construction is that the intercooler is mounted outside the casing of each compressor. Defendant's construction is that the intercooler is mounted "separately from and outside of the gas generator casing."[2]

Defendant's construction is incorrect because it violates the unambiguous language of the claim itself. Claim 1 recites "said gas generator *including* at least one externally mounted intercooler." The word "including" is crucial. By specifying that the gas generator *includes* the intercooler, the claim requires the intercooler to be a *part of* the gas generator. Yet Defendant urges the Court to depart from the unambiguous claim language and conclude that the intercooler is *separate from* and *outside* of the gas generator.[3] *See* Def. Cl. Const. Br. at 7. The Court should decline Defendant's invitation to rewrite the claim. *See Autogiro Co. of Am. v. United States*, 384 F.2d 391, 396 (Ct. Cl. 1967) ("[C]ourts do no rework claims. They only interpret them").

---

[2] Plaintiff does not suggest that the intercooler can be located "inside the gas generator casing." *Contra* Def. Cl. Const. Br. at 7. Rather, the '499 patent specification does not disclose a "gas generator *casing*" at all. Accordingly, Plaintiff does not refer to a "gas generator casing" in his proposed construction.

[3] In fact, Defendant cites to portions of the specification that confirm the intercooler is part of the gas generator, not separate. *See* Def. Cl. Const. Br. at 8 (citing col. 5, lines 40-45 ("the *intercooled* gas generator") and Figure 1 (depicting gas generator 20, including intercoolers 38 and 40)).

As noted in Plaintiff's opening brief, the location of the intercooler is determined by reference to the compressors. According to claim 1, the externally mounted intercooler is "positioned between said low pressure compressor and said high pressure compressor." It is reasonable for the two compressors to act as the structures that define the location of the intercooler. Therefore, the intercooler is mounted outside the compressors.

Defendant argues that the intercooler must be outside of the "gas generator casing." But the specification makes no mention of a "gas generator casing." Therefore, the specification does not provide any support for Defendant's argument that the intercooler is outside the "gas generator casing." On the other hand, the specification *does* disclose low and high pressure casings, and also shows that the intercooler is mounted outside the low and high pressure compressor casings. *Cf.* Def. Cl. Const. Br. at 8 (citing to DA12, col. 7, lines 24-32, which discloses low pressure compressor outer casing 72 and high pressure compressor outer casing 78). Accordingly, one of ordinary skill in the art would understand that the '802 patent discloses an intercooler mounted outside the compressor casings. The Court should decline to import "gas generator casing"—an undisclosed structure—into the construction of this term.

Contrary to Defendant's arguments, Plaintiff's construction is consistent with the prosecution history, including statements made regarding the Hull and DuPont references. Conversely, the prosecution history provides no "clear and unmistakable" disclaimers that correspond to Defendant's narrow limitations. *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1211 (Fed. Cir. 2008) (finding no disclaimer under "clear and unmistakable" standard).

First, Plaintiff's construction conforms to the distinction over Hull. Defendant concedes that Hull discloses intercooler 16 mounted in the axial flow path from compressor 17. *See* Def. Cl. Const. Br. at 12. However, Defendant argues that, because Hull discloses air flow "radially

up and then back down" *inside* the intercooler 16, Plaintiff's construction does not reflect what was disclaimed. *Id.*

That argument is misplaced. The issue regarding the "externally mounted intercooler" is the *location of the structure itself*. The flow path of the air *inside* the intercooler is irrelevant to the actual *location* of the intercooler. Even with the internal air flowing "radially up and then back down," the Hull intercooler 16 is still located in the axial flow path from compressor 17. Exh. G to Pl. Cl. Const. Br., Figs. 3-6. There is no evidence that the inventor disclaimed internal flow paths "radially up and then back down." However, the inventor did disclaim the Hull structural arrangement in which the intercooler was mounted in the axial flow path of the compressor, which created significant pressure losses. Exh. D to Pl. Cl. Const. Br., p. 8. Plaintiff's construction properly captures the disclaimer of Hull.

Second, the distinction over DuPont is also reflected in Plaintiff's construction. Defendant emphasizes that the DuPont intercooler 28 receives radial, not axial, air flow. Thus, according to Defendant, Plaintiff's construction does not reflect the disclaimer of DuPont.

Defendant's argument lacks merit because Defendant is referencing the wrong DuPont intercooler. The inventor specifically stated that, in DuPont, "the axial flow fan 18 discharge air [is] being fed directly to heat exchanger *26*." Exh. D to Pl. Cl. Const. Br., p. 9 (emphasis added). It was the DuPont intercooler *26* that was distinguished from the claimed externally mounted intercooler, on grounds that it was in the axial flow path of the fan (which served as a low pressure compressor). Plaintiff's construction captures the distinction.

On the other hand, with respect to the DuPont intercooler *28* referenced by Defendant, the inventor noted that the entrance duct to intercooler 28 has "very little change in cross-sectional flow area." *Id.* Therefore, the DuPont intercooler 28 was distinguished because its

entrance duct did not "decelerate the air with a minimum of pressure loss." *Id.* In other words, the DuPont intercooler 28 did not have an entrance duct "configured to radially expand said air flow to a low velocity," a *different* limitation of claim 1. In summary, the inventor distinguished DuPont intercooler *26* because it was in the axial flow path and not "externally mounted," and he distinguished the DuPont intercooler *28* because its entrance duct did not deliver "low velocity" air flow. Plaintiff's disclaimer properly reflects the distinctions made by the inventor over DuPont.

Defendant also argues that the inventor disclaimed "an annular intercooler." In support, Defendant relies on the inventor's statements distinguishing the Hull and DuPont references as having "annular ducting and intercooler." Def. Cl. Const. Br. at 10-11 (citing DA66-69). Plaintiff's construction—"excluding an intercooler that is mounted in the axial flow path of either compressor"—reflects the distinction. In other words, the inventor disclaimed "annular ducting and intercooler" together, such as can be found in the Hull and DuPont arrangements. Considering the prosecution history as a whole, there is no "clear and unmistakable" disclaimer of all annular intercoolers.[4]

Defendant's other arguments are similarly flawed. For example, Defendant argues that Plaintiff's construction of the phrase "externally mounted" outside the compressors would be redundant with the claim phrase "positioned between." Def. Cl. Const. Br. at 12. But redundancy is not created, because the phrase "positioned between" describes the relationship of the structures along the air flow path, as illustrated in other portions of the claim. Exh. B to Pl. Cl. Const. Br. at col. 4, lines 57-58 ("said compressor outlet and return ducts and connections

[4] Similarly, there is no "clear and unmistakable" disclaimer requiring a "separately mounted" intercooler, as Defendant suggests. Def. Cl. Const. Br. at 10-11 (citing DA69-70). Taken in context, the prosecution statement relied upon merely reflects that the intercooler is outside the casings of the two compressors.

*between* said compressors and said intercooler are provided *between* said *axially positioned* low and high pressure compressors") (emphasis added). Conversely, "externally mounted" refers to the *radial* location of the intercooler, *i.e.*, the intercooler is radially outside the compressor casings, relative to the central axis.

Thus, in claim 1, the intercooler is "positioned between" the compressors, and it is further limited by being "externally mounted," *i.e*, mounted outside the casings—and the axial flow path—of the compressors. Plaintiff's construction gives the proper meaning to "externally mounted," without redundancy.

Defendant also argues that its construction is preferable because it "is similar to that adopted by the Magistrate in the Texas action." Def. Cl. Const. Br. at 12-13. However, Defendant's construction is fundamentally different than the Magistrate's construction, in a manner that was expressly rejected by the Magistrate himself. *See* Exh. L, Tr. of Proceedings held on April 3, 2007 before Magistrate Judge John D. Love, pp. 36 (CA 6:05-CV-330, E.D. Tex. [Docket Entry dated April 24, 2007]) ("The Court's claim construction says that the heat exchanger is located outside the casing containing the low and high pressure compressors. It does not say it is located outside the engine casing."). Furthermore, the Magistrate rejected a proposal to exclude "an annular intercooler" from this term, similar to Defendant's present proposal. *See Rice v. Honeywell Int'l Inc.*, No. 6:05-CV-330, 2006 WL 3420247 at *11 (E.D. Tex. Nov. 21, 2006) (claim chart comparing proposed constructions with adopted constructions). Accordingly, Plaintiff's construction is proper.

**B. <u>Outlet Duct Configured to Radially Expand Air Flow to a Low Velocity</u>**

The parties dispute the meaning of "low velocity." Defendant suggests that "low velocity" must be limited to a specific embodiment, while Plaintiff urges that the plain and

ordinary meaning governs.

The phrase "low velocity" is inherently a relative term, and the context provided by claim 1 provides further demonstration that it is a relative term. The outlet duct is configured "to radially expand the air flow to a low velocity." In the context of claim 1, the low pressure compressor discharges the air flow at a high velocity. Defendant agrees with this assessment. *See* Exh. D to Pl. Cl. Const. Br, p. 8 ("[I]t is commonly known … that the exit velocity of an axial flow compressor is typically mach 0.3 … ."); *cf.* Def. Cl. Const. Br. at 13 (citing same).[5] If the outlet duct is "configured to radially expand said air flow to a low velocity," then the resulting velocity has to be lower. Thus, the claim language is consistent with the specification.

The specification confirms that a specific magnitude for "low velocity" is not required. In fact, the specification disclosure includes at least three different low velocities in the outlet duct. Exh. A to Pl. Cl. Const. Br., col. 8. lines 10-12 ("The gas velocity exiting diffuser 102 is at about Mach 0.14 corresponding to about 200 ft/sec according to the base temperature involved."); col. 14, lines 11-12 ("The exit 242 velocity would be about 100 ft/sec (Mach 0.075)."); col. 8, lines 58-61 ("[T]he exit velocity at flange 268 is now about 50 to 75 ft/sec, *or the desired velocity* for low pressure loss flow … .") (emphasis added). The use of the disjunctive "or" implies that "the desired velocity" can be different from "about 50 to 75 ft/sec" and is selected based on achieving low pressure loss, rather than a specific magnitude of velocity. This broad disclosure of multiple low velocities confirms that a particular magnitude is not an "essential" feature of the claimed invention. *See Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007) (finding certain feature of disclosed embodiment was

---

[5] However, Defendant erroneously concludes that, because the high velocity exit is "commonly known," it is understood that low velocity is "desirable." Def. Cl. Const. Br. at 3, 13. The conclusion does not necessarily follow, as evidenced by the high velocity intercoolers of Hull and DuPont.

not identified "as an essential component of the invention").

Defendant relies on the *Sinorgchem* case as authority that a numeric value in an embodiment can limit claim scope. Def. Cl. Const. Br. at 17 (citing *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136-38 (Fed. Cir. 2007)). However, in *Sinorgchem*, the Federal Circuit recognized cases standing for the proposition that, generally, "a claim construction should not import numerical limits into a claim that does not contain such limits. 511 F.3d at 1136 n.1. Instead of overruling that authority, the *Sinorgchem* court simply noted that such cases were inapplicable to the case at bar "where the numerical limit is included within an express definition set forth in the specification." *Id.* However, the '499 patent specification certainly does not set forth an "express definition" that "low velocity" *must be* lower than 200 feet per second. In fact, according to Defendant, the specification discloses that a low velocity of 200 feet per second "*may* be utilized in the invention." Def. Cl. Const. Br. at 17 (emphasis added). Accordingly, the *Sinorgchem* exception does not apply here. Defendant's attempts to limit "low velocity" to a specific magnitude should be rejected.

The prosecution history contains no "clear and unmistakable" disclaimer of low velocity above 200 feet per second. During prosecution, the inventor noted that in the DuPont heat exchanger 26, "[a] low velocity of mach less than 0.10 is needed." Exh. D to Pl. Cl. Const. Br., p. 9. This statement characterizes what is needed *for DuPont*, but it is not a statement about the claimed invention. Defendant suggests that this lone statement amounts to a disclaimer of claim scope. However, a statement that refers to the prior art does not limit the claimed invention. Accordingly, there is no "clear and unmistakable" disclaimer to warrant Defendant's narrow limitation. *E.g.*, *Lucent Techs., Inc. v. Gateway, Inc.* 525 F.3d 1200, 1211 (Fed. Cir. 2008).

Defendant argues that Plaintiff's construction would make the low velocity term "superfluous" because "to radially expand said air flow" necessarily results in a decreased velocity. Def. Cl. Const. Br. at 18. The argument is without merit. As explained above, the phrase "radially expand said air flow" adjoins the phrase "to a low velocity" and provides the context and meaning for "low velocity." The two phrases are not redundant. Setting forth results that necessarily follow from other claim limitations is not objectionable; it is to be encouraged. At least one commentator has said that results necessarily following from structures represent good claim drafting: "There is never any objection to functional statements that merely set forth the … results that necessarily follow from the structure previously cited." Exh. M, Robert C. Faber, Landis on Mechanics of Patent Drafting § 3:21, 3-48 to 3-49 (5th ed. 2003). Here, claim 1 recites that the outlet duct is configured to radially expand the air flow, with "a low velocity" being the necessary result. The claim language is clear, and Plaintiff's construction captures its ordinary meaning without redundancy.

The parties also dispute the meaning of "radially." However, Defendant concedes that its "generally perpendicular to the axis" language is not strictly required by the specification, which discloses that the duct can be "curved backwards or slightly forward." Def. Cl. Const. Br. at 16. In fact, Figure 7a illustrates that the return duct can "radially expand" the air flow, without doing so in a direction "generally perpendicular to the axis of the gas generator."



Fig. 7a

Accordingly, "radially" means "away from the axis of the shafting," as proposed by Plaintiff.

### C. <u>Return Duct Configured for Low Radial Flow Return Velocity</u>

Again, the parties' primarily dispute whether the velocity in this term is limited to the specific embodiments. However, Defendant starts with the faulty premise that the "low radial flow return velocity" term is identical to the "low velocity" term in the outlet duct. Def. Cl. Const. Br. at 19.[6] Thus, Defendant suggests that the Court read "radial flow return" out of the claim, which would be improper. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) (noting that "all claim terms are presumed to have meaning in a claim"). On the other hand, Plaintiff proposes a construction that gives the proper

---

6 The outlet duct and the return duct both manage the air flow to and from the intercooler. Exh. A to Pl. Cl. Const. Br., col. 7, lines 37-40 ("The dual ducting and intercooler arrangement makes it possible to manage the flow of the low-density high-volume air to and from the intercooler(s) more efficiently with a lower overall pressure loss."). Thus, they have related, but different functions. One expands the air flow to a low velocity for delivery to the intercooler. The other receives the low velocity air flow from the intercooler, returns it to the axis and then accelerates it into the high pressure compressor.

However, Defendant suggests that the Court ignore the important differences. Based on this error, Defendant tries to support its construction with arguments similar to those offered for the "outlet duct" term. The arguments are not persuasive, for at least the reasons stated in the previous section.

meaning to each term in the disputed phrase.

Under a plain reading of the claim language, "low radial flow return velocity" has a different meaning than "low velocity" in the previous term. This term means that the *radial* velocity of the air flow—the air flowing in the return duct *towards the axis* of the gas generator—is low. *Cf.* Def. Cl. Const. Br. at 20 (acknowledging that "radial" adds meaning to this term). In the context of the claim, the return duct also has an axial component, which delivers the air flow *axially* into the high pressure compressor.

According to Defendant's construction, however, the *entire* return duct would have to direct the air leaving the intercooler in a radial direction. But Defendant's construction would be contrary to the specification. *See* Exh. A to Pl. Cl. Const. Br, Figs. 2, 3, 4, 7a (each depicting a return duct that directs the air flow radially from the intercooler and then axially into the high pressure compressor). By reciting "radial," this term refers to the air flow velocity in the radial portion of the return duct (from the intercooler), which is lower than air flow velocity in the axial portion of the return duct (to the high pressure compressor).

The specification does not require that the return duct "maintain" the air flow at some velocity throughout the return duct, as Defendant asserts. Def. Cl. Const. Br. at 21. The specification clearly discloses just the opposite, because it shows that the return duct decreases from a large, "generous cross-sectional area" near the intercooler to a much smaller cross-sectional area at the mouth of the high pressure compressor. *E.g.*, Exh. A to Pl. Cl. Const. Br., col. 8, lines 25-26; Fig. 7a. A decrease in the cross-sectional area of the duct corresponds to an increase in the resulting air flow velocity. *Cf.* Def. Cl. Const. Br. at 18 (noting that expansion of the air flow results in a decreased velocity). Therefore, the embodiments clearly show that, in the return duct, the air flow velocity increases from a low velocity exiting the intercooler in a

radial direction to a high velocity entering the high pressure compressor in an axial direction. Defendant's construction—requiring the air flow velocity to be *maintained* below 200 feet per second—would improperly exclude specific embodiments disclosed in the specification.

Defendant's also identifies two statements from the prosecution history, taken out of context, in its attempt to limit to the "low radial flow return velocity" to less than 200 feet per second. Def. Cl. Const. Br. at 19-20 (citing DA39 and DA67). The first statement Defendant relies upon was made during prosecution of a parent application. Therefore, it is of limited value in construing the present term (added during prosecution of the asserted claim). The second statement, as noted above, refers to the velocity required for the DuPont intercoolers, not the claimed intercooler. Collectively, and considering the entire context of the statements, there is no "clear and unmistakable" disclaimer that would justify Defendant's narrow construction.

### D. <u>Connections</u>

The parties dispute whether "connections" refers narrowly to additional piping (as Defendant proposes) or broadly to any type of connective structures such as flanges (as Plaintiff proposes). Contrary to Defendant's arguments, the term should be given its plain and ordinary meaning, which is any structure that connects. *See* Pl. Cl. Const. Br. at 21 n.8 (citing Exh. J, p. 278 and Exh. K, p. 387).

According to the plain language of claim 1, the recited outlet and return ducts communicate the air flow from the low pressure compressor to the intercooler and then to the high pressure compressor. Exh. A to Pl. Cl. Const. Br, col. 23, lines 31-35 ("at least one compressor outlet duct communicating with said intercooler, and at least one return duct communicating with said high pressure compressor"). No additional structure is recited to communicate the air flow, and no such structure would be necessary. Defendant ignores the

context of the claim and proposes additional piping, which adds nothing to the claim beyond what is already accomplished by the ducts.

In fact, the specification uses "connections" very broadly, indicating that the term includes any structure that connects, such as flanges. *See*, *e.g.*, *id.* at col. 12, lines 22-23 ("flange connection 190"); col. 13, lines 23-24 ("coupling flange connection"); col. 14, lines 54-55 ("flanges 264 and 266 connect the expansion joint 260 to the ducting"); col. 14, line 58 ("round flange connection 68"); col. 14, line 67 ("Flanges 276 are connected to line 36"); col. 15, line 3 ("flange connection 278"); *cf.* Def. Cl. Const. Br. at 24 (acknowledging the specification's use of "connections" to in a variety of contexts to indicate one structure is connected or flanged to another). Thus, the specification uses "connections" in its plain and ordinary meaning. In the context of claim 1, "connections" refers to any structures, such as flanges, that connect the outlet and return ducts to the intercooler, permitting air flow to and from the intercooler.

Defendant suggests that the applicant clearly and unmistakably disclaimed the broad, plain and ordinary meaning of "connections" during prosecution. *See* Def. Cl. Const. Br. at 22-23. But, contrary to Defendant's arguments, the prosecution history does not establish any such disclaimer.

Specifically, Defendant relies on the following statement made in distinction over the prior art: "Hull uses annular ducting and intercooler and not separate piping to an externally mounted intercooler." *See id.* at 23 (quoting from DA66-67). However, this statement is consistent with the recited elements of the claim, namely, the outlet and return ducts that communicate the air flow to and from the intercooler. In other words, the "separate piping" refers to the recited duct structures. Notably, when the inventor made the arguments distinguishing the claim from Hull, the term "connections" was already part of the claim, and

was not added as part of the amendment. There is no basis for concluding that "connections" refers to "separate piping."

Confirming this understanding, Defendant notes that "the separate piping is instrumental in properly *managing the air flow* to the … intercooler." Def. Cl Const. Br. at 23 (emphasis added). But as explained in the specification, the ducts already perform this very role. As set forth in the specification, "[t]he dual ducting and intercooler arrangement makes it possible to *manage the flow* of the low-density high-volume air to and from the intercooler(s) more efficiently with a lower overall pressure loss." Exh. A to Pl. Cl. Const. Br., col. 8, lines 37-40 (emphasis added). Thus, the additional "piping" proposed by Defendant would be redundant to the recited "ducts and connections."

**E. <u>The Areas Limitation</u>**

Plaintiff proposes an amended construction for the flow areas limitation in which the airflow temperature terms $T_{HPC}$ and $T_{LPC}$[7] are expressly construed. This proposed construction is discussed in Plaintiff's Opening Claim Construction Brief[8] but was not included in the original proposed claim construction. The amended proposed construction is as follows:

| |
|---|
| The ratio of the low pressure compressor outlet flow area ($A_{LPC}$) and the high pressure compressor inlet flow area ($A_{HPC}$) matches the absolute temperature ratio between the high temperature for air flow that the low pressure compressor is capable of discharging ($T_{LPC}$) and the low temperature of air flow for air flow that the intercooler is capable of providing to the high pressure compressor ($T_{HPC}$), where the matching relationship can also be represented mathematically as $T_{LPC}/T_{HPC} = A_{LPC}/A_{HPC}$ |

7 The high temperature airflow limitation ($T_{HPC}$) is the phrase "the high temperature airflow discharged from the low pressure compressor." The low temperature airflow limitation ($T_{LPC}$) is the phrase "the low temperature air flow from the intercooler passing to the inlet area of the high pressure compressor."

8 Pl. Cl. Const. Br. at 26-27. Consistent with Plaintiff's position that the apparatus claim needs to cover what the apparatus *is* instead of what it *does*, the amended construction omits the phrase "while the system is producing power" from the original claim construction.

As discussed below, the amended construction tracks the actual claim language, and accurately construes claim 1 as an apparatus claim to properly cover what the apparatus "is" rather than what it "does."[9] The parties agree that the disputed limitation can be expressed mathematically as $T_{LPC}/T_{HPC} = A_{LPC}/A_{HPC}$. Def. Cl. Const. Br. at 26. The central dispute appears to be over temperatures, namely, how to construe the temperature limitations, $T_{HPC}$ and $T_{LPC}$. Air flow temperatures refer to what a system *does* (when it is turned on); therefore, the air flow temperature terms need to be construed according to the *structures* to which they correspond.

More particularly, the temperature limitations should be construed in terms of the *capacity* of the relevant structures to deliver air having the recited high and low temperatures. Specifically, the "the high temperature airflow discharged from the low pressure compressor" should be construed to mean "the high temperature of the air flow that the low pressure compressor is capable of discharging." Similarly, "the low temperature air flow from the intercooler passing to the inlet area of the high pressure compressor" should be construed to mean the low temperature of the air flow that the intercooler is capable of providing to the high pressure compressor"

In *Cyrix Corp. v. Intel Corp.*, 846 F. Supp. 522, 536 (E.D. Tex. 1994), the claimed microprocessor was recited as "storing" particular information. The defendant had argued that, to fall within the scope of the claim, a microprocessor had to be activated in order to meet the "storing" limitation. *Id.* at 536-37. The court rejected that argument, stating: "To infringe an apparatus claim, it is not necessary for an accused device actually to be performing the functions specified by the claim. All that is required is that the device have the claimed structure, and that

---

9 It is well-settled that "apparatus claims cover what a device *is*, not what a device *does*." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990) (emphasis added).

this structure in the device have the *capability* of functioning as described by the claim." *Id.* at 536.

Similar logic applies here. To prove infringement, the accused device needs to have the claimed structures, i.e., the intercooler and the low and high pressure compressors. Further, those structures need to "have the capability of functioning as described by the claim." Thus, the low pressure compressor needs to be capable of discharging the recited high temperature air flow. Also, the intercooler needs to be capable of passing the low temperature air flow to the inlet area of the high pressure compressor.

Defendant disputes Plaintiff's construction with three main arguments: (1) claims should not be construed with reference to the accused device, (2) the '499 specification does not suggest evaluating the matching relationship using temperature capabilities of the low pressure compressor and intercooler, and (3) the Texas District Court rejected the plaintiff's claim interpretation. Each of those arguments is addressed below.

As to Defendant's first argument, Plaintiff is not seeking to construe the claims with reference to the accused device. Although Defendant is correct that *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1370, 1350 (Fed. Cir. 2007) referenced the capabilities of the accused device in the context of an infringement analysis, the same principle applies to claim construction, since the purpose of claim construction is to provide a claim scope that can be compared to the accused device (for evaluation of infringement) and the prior art (for evaluation of validity). *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1363 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."); *Two-Way Media LLC v. Am. Online, Inc.*, 508 F. Supp. 2d 526, 531 (S.D. Tex. 2007) (revisiting claim construction in light of the parties' summary judgment

motions).

Second, Defendant argues that the ‘499 specification does not suggest evaluating the matching relationship using temperature capabilities of the low pressure compressor and intercooler. Def. Cl. Const. Br. at 31. That is incorrect, since the structures disclosed in the specification inherently have the capability of providing air flow with the recited air flow temperatures. *See*, *e.g.* Exh. A to Pl. Cl. Const. Br., col. 9, lines 1-40 (identifying examples of different air flow temperatures).

Third, Defendant relies on the Texas district court's non-infringement ruling. Def. Cl. Const. Br. at 31-32. But that ruling is inapplicable here. The Texas litigation involved a later version of the WR-21 engine, different than the original WR-21 engine which is at issue in this case. For example, the WR-21 engine in the Texas case had a re-designed intercooler that was different than the intercooler used in the WR-21 at issue here.

Defendant's flawed construction includes three interrelated requirements, each relating in some way to how the claimed system is built: (1) a "design point," defined as "a single, particular predetermined operating condition" of the intercooler, (2) a design method, requiring the compressor flow areas to "increase or decrease" and (3) a prosecution disclaimer that references design methodology, namely "changing" compressor speed or air flow velocity. The construction is erroneous because it fails to give proper weight to the actual claim language. It also improperly defines the system of claim 1 in terms of how an accused engine *was* designed, rather than its present capabilities. Moreover, it places undue reliance on the specification.

Defendant's construction requires a "design point," defined as "a single, particular predetermined operating condition" of the intercooler. Def. Cl. Const. Br. at 25. More specifically, the defendant's proposed claim construction states:

> This phrase is a design rule applied to optimize the cross-sectional area of the air flow inlet of the high pressure compressor (HPC) in relation to the cross-sectional area of the air flow outlet of the low pressure compressor (LPC) for a single, particular predetermined operating condition (the design point) of the intercooler.

The term "design point" appears nowhere in the claims, specification, or prosecution history. The proposed "design point" definition does not clarify or define the express claim language. For example, there is no language in the claim suggesting that cross-sectional areas are being "optimized." Further, requiring an operating condition that is "predetermined" not only goes beyond the language of the claim, but requires an assessment beyond the actual apparatus itself. Nothing in the claim language suggests predetermined operating conditions, much less a "single predetermined operating condition." Rather than proposing a construction that clarifies the claim language, Defendant suggests a restrictive construction that gives the claim an improperly narrow scope.

A "design point" is simply a convenient reference point for designing the gas turbine. According to Defendant's construction, however, a gas generator would not be covered by claim 1 if the engineer had some "design point" in mind that did not meet the flow area and temperature ratio relationship, *regardless* of whether the gas generator's structures had the required capabilities for high and low temperature air flows. However, once built, gas turbines have a spectrum of capable operating conditions, including those that are different from the "design point." *E.g.*, Bowen I, Exh. J to Def. Cl. Const. Br., p. 9.[10] Therefore, the structures of the claimed gas generator cannot be limited to a single "design point."

Defendant's proposed claim construction also inherently requires a design methodology. Defendant's proposed claim construction states that the cross-sectional area of the air flow inlet

---

[10] "Gas turbines used in naval applications are required to operate at part load conditions for most of the total time utilized. Thus, the variation in thermal efficiency of a regenerated marine gas turbine is usually more important than its design point efficiency."

of the high pressure compressor is optimized:

> by *having the areas increase or decrease together* on a constant ratio basis between them and (2) by having the cross-sectional area of the air flow inlet of the high pressure compressor *also increase or decrease* inversely to the ratio of the absolute temperature of the air flow at the cross-sectional area of the air flow outlet of the low pressure compressor divided by the absolute temperature of the air flow at the cross-sectional area of the air flow inlet of the high pressure compressor (i.e., the area *increases* as the ratio gets smaller and *decreases* as the ratio gets larger) such that the expression $T_{LPC}/T_{HPC} = A_{LPC}/A_{HPC}$ is satisfied. (Emphasis added.)

Interpreting the claim to require that the system be built in a particular way is legally flawed. A product claim is not properly limited to any particular method of manufacture, and particularly not to the manufacturing method described in the specification for enablement purposes. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1336-37, 1337 n.10 (Fed. Cir. 2003) (noting that the claimed EPO-producing cell was not limited to the enablement technique of making it).

The defendant relies heavily on the specification to support its proposed design point construction. But that part of the specification is part of the "Description of the Preferred Embodiments." Exh. A to Pl. Cl. Const. Br., col. 6, lines 21-22. There, the specification teaches that the compressor flow areas of an existing gas generator can be modified to arrive at the claimed invention. *See id.* at col. 9, lines 1-62.

However, modifying compressor sizes is simply an enabling description of one way to build a specific embodiment of the claimed system, as required by 35 U.S.C. § 112 ¶1. The claim itself does not have the enabling details found in the specification, and it would be improper to incorporate those details into the claim construction. It can easily be seen, for example, that the approach described in the specification need not be followed for building the claimed system. For example, a power producing system falling within the scope of the claim

could be built "from scratch" with original, unmodified compressor sizes, in which case there would be no "increase" or "decrease" of flow areas. The design approach cannot be included in the scope of claim 1.

Finally, Defendant proposes the following prosecution disclaimer:

> The claim does not cover an apparatus in which the low pressure compressor and high pressure compressor matching relationship is achieved by way of changing a compressor speed or by changing the velocity of the air flow through the compressors.

Defendant thus seeks to exclude modifying the speed of the low and/or high pressure compressor, and/or the velocity of the air flow, to accommodate the addition of an intercooler. To support this extraneous limitation, Defendant cites to the prosecution history. Def. Cl. Const. Br. at 29-30 (citing DA84 [G000855]). However, Defendant omits the following statement from the same paragraph: "Such adjustments *are not excluded* by the present invention, provided the area and temperature relationships are satisfied to achieve the substantial low pressure compressor and high pressure compressor matching which is claimed." Exh. E to Pl. Cl. Const. Br., p. 5 [G000855] (emphasis added).

Thus, the inventor plainly stated that modifications to compressor speeds or changes to air flow velocity *are not excluded* from the claimed system. There is no "clear and unmistakable" disclaimer of modifying compressor speed or air flow velocity. *E.g.*, *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1373 (Fed. Cir. 2007) (finding "clear and unmistakable" standard for prosecution disclaimer not satisfied). This term only governs the described compressor area and temperature ratio relationship, without regard to changes in compressor speeds or air flow velocity.

Critically, the proposed additional limitation underscores Defendant's flawed approach. By suggesting the claim excludes "changing" compressor speed or air flow velocity, Defendant

again implies that the claimed system must be compared to a predecessor engine. In other words, Defendant suggests that the claimed system must have the same compressor speed and air flow velocity as some previous system. *E.g.*, Def. Cl. Const. Br. at p. 30. That type of construction is not appropriate for the apparatus of claim 1, because it would require comparison to another, unclaimed system. *Cf. id.* at 29 n.10 (agreeing that the claim does not cover "the 'act' of designing an engine").

At a fundamental level, Defendant's "design point" approach improperly requires a particular method in arriving at the claimed system, such as an engineer's choice of reference point, or modifying some unclaimed predecessor engine. Therefore, Defendant's construction must be rejected for the apparatus of claim 1.

## III. CONCLUSION AND PRAYER FOR RELIEF

Based on the foregoing, and for the reasons presented in Plaintiff's Opening Claim Construction Brief, Plaintiff Ivan G. Rice respectfully requests that the Court enter an Order construing the disputed terms in accordance with his proposed constructions.

Respectfully submitted,

Date: June 23, 2008

s/ Douglas H. Elliott
DOUGLAS H. ELLIOTT
Lead Attorney
Patterson & Sheridan, LLP
3040 Post Oak Blvd., Suite 1500
Houston, Texas 77056
Tel (713) 623-4844
Fax (713) 623-4846
delliott@pattersonsheridan.com

*Attorneys for Plaintiff Ivan G. Rice*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served on the parties listed below, in the manner indicated, on this 23rd day of June, 2008:

***Via the Court's CM/ECF electronic service procedures***:

Ken B. Barrett, Esq.
Civil Division - Commercial Litigation Branch
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW, Room 11122
Washington, D.C. 20005
Fax: (202) 307-0345
E-mail: ken.barrett@usdoj.gov

*Counsel for The United States of America*

***Via the Court's CM/ECF electronic service procedures***:

Richard E. Rice, Esq.
OLIFF & BERRIDGE, PLC
277 South Washington Street, Suite 500
Alexandria, VA 22314
Fax: (703) 836-2787
E-mail: rrice@oliff.com

*Counsel for Rolls-Royce PLC*
*(Interested Party)*

***Via email***: ***constance.huttner@bipc.com***

Constance S. Huttner, Esq.
BUCHANAN, INGERSOLL & ROONEY, PC
One Chase Manhattan Plaza, 35th Floor
New York, NY 10005-1417
Fax: (212) 440-4401
E-mail: constance.huttner@bipc.com

*Counsel for Honeywell International Inc.*
*(Interested Party)*

s/ Douglas H. Elliott
Douglas H. Elliott

804667_1